352 So.2d 45 (1977)
David KERLIN, Petitioner,
v.
STATE of Florida, Respondent.
No. 50211.
Supreme Court of Florida.
June 30, 1977.
*46 Joe M. Mitchell, Jr., Melbourne, and Kenneth A. Studstill, Titusville, for petitioner.
Robert L. Shevin, Atty. Gen., and A.S. Sid Johnston and Harry M. Hipler, Asst. Attys. Gen., for respondent.
KARL, Justice.
We have for review, on petition for writ of certiorari granted, the decision of the District Court of Appeal, Fourth District, in Kerlin v. State, reported at 351 So.2d 1026 (Fla. 4th DCA, 1976), which purportedly conflicts with Mercer v. State, 40 Fla. 216, 24 So. 154 (1898). We have jurisdiction pursuant to Article V, Section 3(b)(3), Florida Constitution.
After a first trial resulted in a hung jury, petitioner, David Kerlin, a/k/a David Giglietti, was convicted of second degree murder and was sentenced to thirty years imprisonment for the killing of one George Fitch, who was found in his bedroom shot to death by a .22 caliber rifle.
During the course of petitioner's trial, his wife, the state's chief witness who had been *47 given immunity for her testimony, testified as to her observation of the criminal actions (non-verbal communications) of her husband surrounding the murder of Fitch.
Petitioner's wife testified that she and petitioner arrived in Florida in 1974 as hitchhikers from Virginia; that, upon arriving in Florida, they met Fitch and subsequently temporarily moved in with him in his home in Titusville; that, approximately one week prior to Fitch's death, she observed petitioner take from Fitch's mailbox what appeared to her to be a government check; and that petitioner gave her Fitch's savings book and, thereafter, requested it back, at which time she accompanied him to the bank where he filled out a withdrawal slip, approached the teller and received a sum of money. After being cautioned not to repeat any conversations her husband had had with her, she testified, as to her observations of petitioner's actions on the morning of the murder, that petitioner, she and the victim were alone in Fitch's house, several persons having left the house earlier that morning; that the defendant put down the newspaper he was reading, went into one of the two bedrooms, came out with a rifle which she identified as State's Exhibit Number 12, and walked into the victim's bedroom; that she heard a muffled shot; that petitioner came out of the bedroom and reloaded the gun in front of her; that he went back into her bedroom and that she heard another shot; that, momentarily, petitioner came out and said, "Let's go," at which they ran from the house. She observed that petitioner had the victim's wallet and checkbook and that he had blood on his face which did not appear to be occasioned by any cut or scratch.
To this testimony by the wife relating to petitioner's conduct, the defense did not expressly object when the testimony was being taken. There does appear in the record a vague "stipulation" which applied to petitioner's first trial, to the effect that, before the jury was sworn during the course of the first trial, the defense made a motion in limine whereby he made objection to the possibility of testimony being elicited by the state attorney from Sandra Kreps Giglietti, the wife of the petitioner, as to matters protected as privileged communications between husband and wife. The stipulation further provided that the state attorney was cautioned not to inquire of said witness as to matters protected as privileged communications between husband and wife.
Petitioner testified at trial that he stole the check belonging to Fitch; that his wife knew of the stealing of the check and voluntarily went with him to the bank to cash it; that he was living at Fitch's house the morning of the murder; but that he did not murder Fitch. On cross-examination, he testified that he did not get along well with Fitch and argued with him on several occasions, and that he forged Fitch's signature. He further testified on cross-examination as follows:
"Q Now you heard her say that you walked into the bedroom; did you walk into the bedroom after you read the paper?
"A Before we left?
"Q Um-hmm.
"A I'm not sure if I walked into the bedroom; I think she walked into the bedroom. There's a possibility that I could have; I'm not absolutely sure.
"Q Now, you heard her say that you came out of the bedroom with that rifle, you saw that rifle, didn't you  did you get a chance to look at that rifle?
"A Yes, sir. I've seen it.
"Q Do you recognize that rifle as being Steve Proctor's rifle?
"A It looks like the same one, yes, sir.
"Q That's the rifle you fired on one occasion with Steve Proctor?
"A I believe so.
"Q You heard her say that you came out of the bedroom with that rifle?
"A Yes, sir.
"Q Did you at any time handle that rifle on that Sunday?
"A No, sir. I did not.
"Q Do you know where that rifle was that Sunday?
"A As far as I know, it was behind the door.

*48 "Q Why do you say it was behind the door?
"A It was always kept behind the door.
"Q Did you see it behind the door that Sunday?
"A I didn't happen to look behind the door that Sunday, no.
"Q Were you ever in George's room that Sunday morning?
"A No, sir.
"Q You were not?
"A No.
"Q When you went to bed Saturday, was the gun behind the door of George's room?
"A I do not know.
"Q When was the last time you'd seen the gun prior to going to bed Saturday night?
"A I couldn't tell you the specific time.
"Q Okay. Now, you heard, you've heard Sandra say that after you came out of the bedroom with that gun, that you said something to her, you heard her say that?
"A Yes, I did.
"Q Didn't you, in fact, say that George was going to cause trouble about the check; you were going to have to kill him?
"A No, sir."
It was only at this point that the defense objected to the prosecutor's remark. Although all the activities of petitioner relative to the stolen check had been explored on direct examination, the basis of his objection was that this remark constituted an alleged violation of the confidential relationship between a man and his wife. After lengthy debate, the trial judge denied the objection, and on further cross-examination, petitioner could not recall the content of any conversation with his wife.
The District Court of Appeal, Fourth District, affirmed the judgment and sentence "on the authority of Gates v. State, 201 So.2d 786 (3d D.C.A., Fla. 1967) and Ross v. State, 202 So.2d 582 (1st D.C.A., Fla. 1967)."
This cause brings before us the application of the privilege for communications between husband and wife and, more particularly, the question of whether this privilege extends to observation of criminal conduct (actions) of one spouse by the other.
In this Court's early decision of Mercer v. State, supra, it was held that written communications between a husband and wife are inherently privileged from the character of the communication itself, and the privilege for marital communications protects them from introduction into evidence. Therein, this Court explained the rationale or public policy of the privilege to be the preservation of the peace, good order and limitless confidence between the heads of the family so as to promote a well-ordered, civilized society and opined:
"The matter that the law prohibits either the husband or wife from testifying to as witnesses includes any information obtained by either during the marriage, and by reason of its existence. It should not be confined to mere statements by one to the other, but embraces all knowledge upon the part of either obtained by reason of the marriage relation, and which, but for the confidence growing out of it, would not have been known. And the same rule prevails in full force even after the marital relation has been dissolved by death or divorce. Where the incompetency as witnesses of husband and wife on the ground of interest has been removed by statute, as is the case here, either of them may testify, for or against the other, to any fact, the knowledge of which was acquired by them independently of their marriage relation, in any manner not involving the confidence growing out of the marriage relation. As Mr. Greenleaf puts it: `The great object of the rule is to secure domestic happiness by placing the protecting seal of the law upon all confidential communications between husband and wife; and whatever has come to the knowledge of either by means of the hallowed confidence which that relation inspires cannot be afterwards *49 divulged in testimony, even though the other party be no longer living.' 1 Greenl. Ev. (15th Ed.) §§ 254, 334, 337; ... ."[1] (Emphasis supplied.)
Even at common law, this communications privilege was recognized to be subject to limitations and exceptions which grew out of necessity, inter alia, to avoid harsh injustice to the excluded spouse which would follow from a strict enforcement of the rule. Explaining the nature of the exception, Dean Wigmore states in Wigmore on Evidence, Section 2239:
"The notion of necessity, indeed, might commendably have been a broader one; the necessity of doing justice to other persons in general, when the spouse's testimony was indispensable, would have been at least as great. But the common lawyers here kept their eyes upon the ground, and did not allow their survey to exceed the range of immediate and unavoidable vision. Anyone could see that an absolute privilege in a husband to close the mouth of the wife in testimony against him would be a vested license to injure her in secret with complete immunity. This much the common lawyers saw, and were willing to concede. Just how far the concession went, in concrete cases, was never precisely settled. It was given varying definitions at different times. It certainly extended to causes involving corporal violence to the wife, and it certainly did not extend to all wrongs done to the wife. In modern statutes the spirit of the exception has usually been invoked to establish the exception for both husband and wife in all causes involving a `crime against the other' or a `personal wrong.'
"But before noting the extent of this exception in detail, it is worth while to observe the common law cases and the statutory rules applying this exception are also equally open to explanation as instances in which the very reason of the privilege  at least the reason most frequently advanced  is lacking. That is to say, if the promotion of marital peace, and the apprehension of marital dissension, are the ultimate ground of the privilege, it is still an overgenerous assumption that the wife who has been beaten, poisoned or deserted is still on such terms of delicate good feeling with her spouse that her testimony must not be enforced lest the iridescent halo of peace be dispelled by the breath of disparaging testimony. And if there were, conceivably, any such peace, would it be a peace such as the law could desire to protect? Could it be any other peace than that which the tyrant secures for himself by oppression? And could the law pretend to regard the effect produced by a wife's testimony in her own redress as being worth consideration on behalf of a husband who has already grossly violated his marital duties? If there had been any reason at all for the privilege, that reason surely fell away in such cases. The common lawyers, more creditably to themselves in point of consistency as well as humanity, might better have placed these cases upon this ground instead of upon that of necessity. It is satisfactory to find that this reasoning has by some judges been appealed to for that purpose."
The Supreme Court of the United States, in Wolfle v. United States, 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617 (1933), wherein the court held that a written communication in the form of a letter from a husband to his wife dictated by the husband to a stenographer was not privileged, opined:

*50 "The basis of the immunity given to communications between husband and wife is the protection of marital confidences, regarded as so essential to the preservation of the marriage relationship as to outweigh the disadvantages to the administration of justice which the privilege entails.
.....
"The privilege suppresses relevant testimony and should be allowed only when it is plain that marital confidence can not otherwise reasonably be preserved. Nothing in this case suggests any such necessity."
In an annotation to Blau v. U.S., 340 U.S. 332, 71 S.Ct. 301, 95 L.Ed. 306, 317 (1950), on the marital communications privilege in federal courts, it was stated that, in the absence of a statute which expands the common law privilege of confidential marital communications, seemingly, such privilege protects only utterances but not observations of facts.
The tendency in this state has been to take a restrictive view of the privilege,[2] not permitting it to preclude from evidence a spouse's observation of another spouse's criminal actions, i.e. independent facts gained by his or her own observation and knowledge and not from any written or oral communications of his or her spouse.[3]
Defendant in Porter v. State, 160 So.2d 104 (Fla. 1963), was charged with the first degree murder of his mother-in-law by severing her head with a machete. During the course of the trial, Porter's common-law wife, the only eyewitness to the crime other than the defendant himself, was permitted to testify in detail as to her observation of his criminal activities surrounding the murder, over defense objection that one spouse cannot testify against the other unless he or she be an interested party to the suit pending. This Court found the argument that this testimony should have been excluded to be without merit, determined that no reversible error had been made to appear and that the ends of justice did not require a *51 new trial, and affirmed the judgment and death sentence.
Gates v. State, 201 So.2d 786 (Fla. 3rd DCA, 1967), was a battered child syndrome case in which the defendant was charged with murder in the second degree of his wife's minor daughter. This wife was permitted to testify at trial over defense objections about a previous act of violence committed by Gates against the deceased child. Finding that the wife's testimony was to an event, not to a communication, the district court held the testimony of the wife to be properly admissible, not falling within the husband and wife privilege.
Appellant in Ross v. State, 202 So.2d 582 (Fla. 1st DCA, 1967), argued that the physical act of delivering a stolen sweater to his wife was a confidential privileged communication, just as a statement to her as to how he had acquired the sweater would have been, and therefore, his objection to her testimony should have been sustained. In response to the posited question as to the trial judge's failure to sustain the objection, Judge Wigginton, speaking for the unanimous court, opined:
"It occurs to us that if the testimony of the wife in Porter was subject to exclusion on any proper ground, its admission would have constituted such fundamental error as to require reversal of the judgment in that case. Since the Supreme Court refused to disturb the judgment it reasonably follows that the testimony of appellant's wife in the case now reviewed, confined as it was to physical acts of her husband, must be considered as not constituting confidential communications privileged under common law principles. We therefore conclude that the ruling complained of was proper and free from error." Ross v. State, 202 So.2d 582, 584.
Most recently, in Smith v. State, 344 So.2d 915 (Fla. 1st DCA, 1977), filed April 6, 1977, the district court held that testimony of the wife as to certain oral communications made to her by her husband after the shooting, regarding his killing of one Jose Fernandez, were improperly admitted into evidence over objection of the defense that such testimony invaded the confidential privilege between husband and wife. The wife testified in vivid detail as to the homicide and the cover-up. The district court noted that the numerous activities of the defendant, about which his wife testified, are not covered by the marital privilege which, the district court explained, applies only to communications and not actions.
We approve the restricted interpretation of Dean Wigmore, an eminent authority on evidence, which limits the privilege of communications between husband and wife to spoken or written statements, signs or gestures, a view which has been adopted by the courts in this state. He explicitly stated, in Wigmore on Evidence, § 2337:
"The privilege has for its object the security from apprehension of disclosure  a security in consequence of which confidences will be freely given and not withheld. The protection therefore extends only to communications, not to acts which are in no way communications. The reasoning is analogous to that which establishes a similar limitation for communications between attorney and client (§ 2306 supra)."[4]
McCormick on Evidence argues for a movement toward restriction of the privilege since extensions beyond verbal or written communications are unjustified. Generally, the acts which would be protected by the privilege are acts done in furtherance of a crime or fraud and, therefore, under the principle developed for the attorney-client privilege, should not be protected. McCormick on Evidence, § 79.[5]
*52 Public policy favors such a restrictive construction of the privilege since observations of criminal actions is not the type of communication contemplated by the privilege of confidential communication as being in the public interest to preserve a well-ordered, civilized society by preserving the peace and harmony of a family.
Although not necessary to the disposition of this cause since we find that the wife's observation of petitioner's criminal activities was not excludable from evidence on the basis of privileged communications, we note that the privilege was waived because the defense failed to object to the introduction of this testimony. The vague stipulation, which relates to the first trial and describes a general objection and a cautionary instruction by the judge, was not sufficient to constitute a proper objection to the wife's testimony as to petitioner's conduct.
The privilege existing between husband and wife as to their communication is a personal privilege which may be waived by the communicating spouse. Tibado v. Brees, et al., 212 So.2d 61 (Fla. 2d DCA, 1968). Waiver occurs by failure to assert the privilege by objection or a voluntary revelation by the holder of the communication, or a material part thereof. Cf. 8 Wigmore on Evidence, § 83.
In Tibado, supra, appellant, at oral deposition prior to trial, voluntarily and without objection testified to confidential communications between him and his wife but, at trial, objected to the introduction of the deposition. The court held that, when he testified without objection on deposition to the privileged communications, they lost their confidential nature. Cf. Savino v. Luciano, 92 So.2d 817 (Fla. 1957). The trial judge has no duty to exclude confidential communications in the absence of timely objection thereto. Cf. State v. Foster, 164 La. 813, 114 So. 696 (1927). By not objecting to the line of questioning relating to the conduct of petitioner, were such conduct contemplated by the privilege, petitioner effectively waived the privilege.
The next point involves the questions directed to petitioner on cross-examination by the state relative to certain oral conversation with his wife. After petitioner responded, "No, sir," to inquiry by the state as to whether petitioner made a certain statement to his wife, defense objected as follows:
"Your Honor, my objection is based on Mr. Herring's violation of the confidential relationship between a man and his wife that a conversation took place." (Emphasis supplied.)
With regard to this specific objection, we note that the privilege does not protect testimony as to the fact of communicating or not communicating. If the purpose of the questioning was to show the act of communicating and not the disclosure of the substance of the communications, the testimony elicited does not come within inhibition of the privilege. An annotation to People of State of New York v. Daghita, 299 N.Y. 194, 86 N.E.2d 172, 10 A.L.R.2d 1385, 1391-2, discussing acts as confidential communications, explains:
"The majority of courts have held that the privilege does not protect testimony as to the fact of communicating or not communicating, as distinguished from the matter communicated."
However, it appears that this objection was intended to exclude the conversation itself as being within the confidential communications privilege. The state posits that the trial court was correct in ruling that, once petitioner testified, he waived the husband-wife privilege as to confidential communications.[6]
*53 We cannot agree with this broad general assertion by the state. As previously stated, this privilege may be waived by the communicating spouse by voluntary revelation of the communication or a material portion thereof, but the fact that the defendant testifies in his own behalf without revealing the contents of the confidential revelation to his or her spouse does not constitute a waiver. Wharton's Criminal Evidence, § 567. When a defendant testifies to conversations with his or her spouse, he thereby waives the privilege and may be cross-examined concerning such conversations. Sub judice, on direct examination of petitioner, no inquiry had been made into oral communications made by him to his wife. However, although the trial court erred in denying petitioner's objection, it merely constituted harmless error because no privileged communications were forthcoming from petitioner who did not recall the contents of any conversation with his wife, if there was any.
Accordingly, we hold that the wife's testimony as to observed conduct was properly admitted into evidence; that her testimony as to any conversations with petitioner, i.e., his statement, "Let's go," was properly admissible since not timely objected to by the defense; and that the trial judge erred in overruling petitioner's objection to confidential oral communications, but such error was harmless under the totality of the circumstances.
Accordingly, the decision of the District Court of Appeal, Fourth District, is approved, and the writ heretofore issued is discharged.
It is so ordered.
OVERTON, C.J., and ADKINS, BOYD and SUNDBERG, JJ., concur.
NOTES
[1] McCormick on Evidence, Section 79, explains Greenleaf's view as follows:

"Greenleaf arguing in 1842 for a privilege distinct from marital incompetency, and furnishing the inspiration for the later statutes by which the privilege was formally enacted, spoke only of `communications' and `conversations.' Those later statutes themselves (except one or two) sanctioned the privilege for `communications' and for nothing beyond. Accordingly it would seem that the privilege should be limited to expressions intended by one spouse to convey a meaning or message to the other. These expressions may be by words, oral, written or in sign-language, or by expressive acts, as where the husband opens a trunk before his wife and points out objects therein to her... ."
[2] We note with interest that the Florida Legislature in the 1976 Legislative Session codified the marital communications privilege recognized in Florida since 1889. Section 90.504, Florida Statutes, effective July 1, 1978, provides:

"(1) A spouse has a privilege during and after the marital relationship to refuse to disclose, and to prevent another from disclosing, communications which were intended to be made in confidence between the spouses while they were husband and wife.
"(2) The privilege may be claimed by either spouse or by the guardian or conservator of a spouse. The authority of a spouse, or guardian or conservator of a spouse, to claim the privilege is presumed in the absence of contrary evidence.
"(3) There is no privilege under this section:
"(a) In a proceeding brought by or on behalf of one spouse against the other spouse.
"(b) In a criminal proceeding in which one spouse is charged with:
"1. A crime committed at any time against the person or property of the other spouse, or the person or property of a child of either; or
"2. A crime committed at any time against the person or property of a third person, which crime was committed in the course of committing a crime against the person or property of the other spouse.
"(c) In a criminal proceeding in which the communication is offered in evidence by a defendant-spouse who is one of the spouses between whom the communication was made."
The comment to Subsection (1) provides:
"This subsection permits one spouse to refuse to disclose, and to prevent the other spouse from disclosing, confidential communications made during coverture. To be privileged, the communications must be made when confidentiality could be anticipated. The privilege is limited to expressions intended by one spouse to convey a meaning or message to the other and not to other `actions' or `facts.' See Ross v. State, 202 So.2d 582 (Fla. 1st Dist. 1967); Gates v. State, 201 So.2d 786 (Fla. 3rd Dist. 1967); McCormick, Evidence § 79 (2nd ed. 1972). The privilege survives death or divorce, to insure total freedom of communication by removing the apprehension of disclosure. 8 Wigmore, Evidence § 2340 (McNaughton rev. 1961).
"Similar provisions are contained in Calif. Evid.Code § 980; N.J.Evid.Rule 28; Kansas Code of Civ.Pro. § 60-428." (Emphasis supplied.)
[3] Signs or gestures used to convey meaning are entitled to the same status as words spoken or written. 10 A.L.R.2d 1389, 1391.
[4] In Kneale v. Williams, 158 Fla. 811, 30 So.2d 284 (1947), this Court held that the perpetration of a fraud is outside the scope of the professional duty of an attorney, and no privilege attaches to a communication between attorney and client with respect to a transaction constituting the making of a false claim or perpetration of a fraud.
[5] McCormick on Evidence, speaking to the policy and future of the privilege, states:

"Accordingly, we must conclude that, while the danger of injustice from suppression of relevant proof is clear and certain, the probable benefits of the rule of privilege in encouraging marital confidences and wedded harmony, is at best doubtful and marginal." § 86.
[6] After much debate on the objection, the trial court ruled:

"I think I am prepared to make a ruling in this instance that the privilege will not be invocable. The discussion here and the rest of this chapter in McCormick's follows the line of Wigmore and the Model Code, and I don't think the point has yet to have been reached in Florida. Therefore, the trial judge has the duty to face up to the problem and the future of this rule is said to be that if the evidence of a communication inquired into the administration of justice, the privilege should yield. The husband and wife privilege, historically grows out of a policy consideration designed to promote peace and harmony in the marriage, and it's a poor public policy, and yet there is another public policy where society is involved in the prosecution for crime it should be examined  the way I take it that if the evidence of a communication is necessary for enforcement of laws against crimes, then the institution of marriage has to take second place. That's a pretty extreme rule. It should make a basis for either upsetting a verdict in judgment on appeal or make some clarification on the law in the State of Florida. I don't know the State wants to go that far."