PER CURIAM.
This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm Bolin’s conviction and sentence.
OVERVIEW
Oscar Ray Bolin, Jr., was convicted of the first-degree murder of Stephanie Collins and sentenced to death. This Court twice reversed Bolin’s conviction and sentence of death for new trials because of evidence improperly admitted that was covered under the spousal privilege. On Bolin’s second retrial, a jury returned a verdict of guilty of first-degree murder. Bolin waived his right to a penalty phase jury, and after a penalty phase proceeding, the trial court sentenced Bolin to death. This is Bolin’s direct appeal. For the reasons below, we affirm Bolin’s conviction and sentence of death.
FACTS AND PROCEDURAL HISTORY
Oscar Ray Bolin, Jr., is before this Court on direct appeal of his conviction and sentence of death for the 1986 murder of Stephanie Collins. In 1990, a Hillsbor-ough County Grand Jury returned an indictment charging Bolin with first-degree murder, attempted robbery, and kidnapping. Bolin was tried and convicted for the murder. The trial judge followed the jury’s recommendation and sentenced Bo-lin to death. On appeal, this Court reversed Bolin’s conviction because improper evidence was admitted at trial. See Bolin v. State (Bolin I), 650 So.2d 21 (Fla.1995) (reversing and remanding for a new trial because the trial court erred in finding that Bolin waived his spousal privilege when he deposed his ex-wife). On remand, Bolin was again tried, convicted, and sentenced to death. On appeal, this Court reversed a second time, based on the admission of improper evidence at trial. Bolin v. State (Bolin II), 793 So.2d 894 (Fla.2001) (reversing and remanding because the trial court erred in finding that Bolin waived his spousal privilege in writing his suicide letter).
Guilt Phase
The evidence presented at the second retrial revealed that Stephanie Collins went missing on November 5, 1986, after stopping by the Eckerd’s Drug Store where she worked. She was last seen on that day in the passenger’s seat of a white van. On December 5, 1986, her body was discovered alongside a road in Hillsbor-ough County. An autopsy revealed that Collins sustained a number of stab wounds and several potentially fatal blows to the head.
The investigation into Collins’s murder proved unavailing until July 1990, when Danny Coby telephoned The Crime Stoppers Hotline in Ft. Wayne, Indiana, with information about the murder. Danny Coby obtained the information from his wife, Cheryl Coby, who had acquired the information during her prior marriage to Bolin. After Mr. Coby’s call, investigators interviewed Mrs. Coby, who provided investigators with details implicating Bolin in the murder.
After Coby’s disclosures, Bolin was extradited to the Hillsborough County Jail to await trial for the murder of Collins. On June 22, 1991, Bolin attempted suicide. After Bolin was taken to the hospital, the chief investigator, Captain Gary Terry, entered Bolin’s cell and saw a cardboard box sitting on the commode. A stamped envelope addressed to Captain Terry was on top of the box. Captain Terry opened the envelope and read the letter, which discussed, among other things, the murder *732 investigation. Prior to the second retrial, the State filed a Motion to Admit Evidence that the Defendant Attempted to Commit Suicide, including the suicide letter addressed to Captain Terry. The trial court granted the motion, and evidence of Bo-lin’s attempted suicide and the suicide letter were admitted at trial over defense objection.[1]
Because Coby suffered from a terminal illness, her trial testimony from Bolin’s first trial was videotaped. Coby died shortly after the first trial, and, in accordance with this Court’s decisions in Bolin I and Bolin II, the State introduced a redacted version of Coby’s testimony during the second retrial, which edited out privileged communications between Bolin and Coby. See Bolin I, 650 So.2d at 23 (concluding that the trial court erred in finding Bolin waived his spousal privilege based on defendant’s deposition of ex-wife but noting that Coby’s testimony regarding her observations of Bolin’s actions were admissible); Bolin II, 793 So.2d at 897, n. 3, 898 (concluding that trial court erred in finding waiver of spousal privilege based on Bo-lin’s suicide letter but noting that the privilege only applied to confidential communications).
Coby’s redacted testimony that was admitted during Bolin’s second retrial included that on November 5, 1986, Bolin, her husband at the time, picked her up from a restaurant and took her back to their travel trailer. Coby explained that, upon their arrival at the trailer, she saw Bolin load something wrapped in one of their quilts onto his truck. Coby also identified a sheet labeled “Hospital Property” that was found wrapped around Collins’s body as a sheet that Coby had taken during one of her hospital stays due to her continual health problems. Coby provided investigators with the same type of sheets when they interviewed her in Indiana. Coby testified that Bolin and Coby drove to a spot where Bolin dumped the body. Coby later identified that spot to police. When she returned to the trailer, Coby observed that everything inside, including a knife beside the kitchen sink that was usually kept in the drawer, appeared wet. Coby also noticed several blood stains in the trailer.
Robert Fram, an FBI hair analyst, testified that hair found on the towel wrapped around Collins’s body matched Bolin’s. Agent John Stewart testified as an expert that the mitochondrial DNA analysis of Bolin’s hair and saliva showed a profile match with that found on Collins’s body.
Lay witnesses Hennie Moss and David Fessler both testified during trial that they saw Collins in a white van with a man they could not identify on the afternoon she went missing. They testified that Collins was acting excited and waving her arms. Collins’s mother identified the clothes Collins was wearing on the day her body was discovered as the same clothes she was wearing on the day she went missing. Law enforcement also found Collins’s purse near her body. The purse contained a piece of paper on which “724-BYL, Ray” was written. Testimony pro *733 vided that Bolin was usually called Ray and 724-BYL was the tag number of Bo-lin’s pickup truck. Michael Long, a friend of Coby and Bolin, testified that he had seen Bolin use a white van years before and that Bolin’s friend had allowed Bolin to borrow it.
The medical examiner, Dr. Peter Lardi-zabal, testified that Collins’s skull was struck several times so hard that parts of her skull were reduced to powder. He testified that there were twenty-eight fragments of the victim’s skull as a result of the blunt force trauma Collins sustained. The medical examiner could identify nine points of impact on her skull and testified that the blows would have been quickly fatal. He also testified that Collins’s body and clothes revealed six stab wounds to her back; however, due to the decomposition of her body, he was unable to tell whether the stab wounds were made while Collins was alive or postmortem.
On November 2, 2006, the jury returned a verdict of guilty of first-degree murder.
Penalty Phase
After the verdict was read, Bolin waived his right to a penalty phase jury. During the penalty phase before the trial court, the State presented evidence of the prior rape and kidnapping of Gennie Lynn Le-fever, to which Bolin pleaded guilty. The State also presented testimony from Rick Luman, a jail guard in Ohio who was attacked by Bolin during Bolin’s escape attempt while incarcerated for the prior rape and kidnapping. The State presented the testimony of Gary Kling, a Pasco County detective assigned to the case of the murder of Teri Lynn Mathews, who suffered blunt force trauma to her head and stab wounds, and whose body was found on the side of the road, for which Bolin was convicted of first-degree murder and received the death penalty. See Bolin v. State, 869 So.2d 1196 (Fla.2004).
The defense presented a mitigation notebook to the trial court, which included: (1) the presentence investigation report and sentencing order for the Pasco County murder for potential mitigation; (2) the testimonies of Bolin’s mother and sister from the prior penalty phase; (3) the deposition and testimony of Dr. Robert Ber-land from Bolin’s prior penalty phase; (4) the testimony of Rosalie Bolin, Bolin’s current wife, from Bolin’s prior penalty phase; and (5) Bolin’s medical records.
During the Spencer[2] hearing on October 29, 2007, the defense proffered evidence from Dr. Frank Wood and Dr. Jonathan Burdette, along with Bolin’s mental health status report. The trial court reviewed all the evidence and found the following ag-gravator: (1) previously convicted of another capital felony or of a felony involving the use or threat of violence to the person — great weight. The trial court also found the following mitigation: (1) age of defendant at time of crime (24) — little weight; and (2) the following statutory catch-all mitigator of any other factors in the defendant’s background that would mitigate against imposition of the death penalty: (a) defendant suffered from the effects of his mother’s alcoholism and his own substance abuse — little weight; (b) defendant was abused as a child — some weight; (c) defendant had a poor and unstable childhood — little weight; (d) defendant had sporadic minimal education — little weight; (e) defendant received his GED while incarcerated — little weight; (f) defendant developed skills which included welding, electrical, plumbing, and small machinery skills — little weight; (g) defendant saved the life of another — little weight; (h) defendant was gainfully em *734 ployed at the time — little weight; (i) defendant behaved appropriately at trial— little weight; (j) defendant has adapted to institutional living and had not received any disciplinary reports — little weight; (k) defendant has been married for eleven years and he seems to maintain that relationship, considering the obvious limitations — little weight; and (l) defendant’s physical and mental medical history indicates several problems — little weight. Additionally, the trial court gave some weight to a finding of some mental or emotional disturbance. The trial court stated in its sentencing order, “Although there is only one aggravating factor, both the nature of the Defendant’s crimes and the underlying facts of those crimes are so egregious that the one aggravating factor far outweighs the mitigating factors in this ease.” Thus, the trial court imposed the sentence of death.
Bolin appeals, raising the following issues for our review: (1) whether the trial court erred in denying Bolin’s motion to exclude Cheryl Coby’s redacted 1991 trial testimony; (2) whether the trial court erroneously denied Bolin’s motion to suppress the suicide note; and (3) whether the trial court erred in rejecting a statutory mitigator and in imposing a death sentence.
ANALYSIS
Guilt Phase Claims
I. Cheryl Coby’s Testimony
During the guilt phase of Bolin’s second retrial, the State read a portion of Cheryl Coby’s testimony from Bolin’s first trial and then played a videotape of a portion of her testimony that had been recorded.[3] In accordance with this Court’s decisions in Bolin ■ I and Bolin II, the portions of Coby’s testimony that referred to privileged communications were redacted.
Bolin now contends that the admission of such dated testimony violates his right to confrontation under Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Specifically, Bolin contends that because former counsel’s cross-examination was inadequate during Bolin’s first trial, and because counsel is now bound by such cross-examination that focused mainly on privileged testimony that has since been held inadmissible, the former cross-examination is not sufficient to bypass the requirements of Crawford. Bolin also asserts that this testimony violates his constitutional right to due process because the admissible testimony was so intertwined with the privileged communications that the redacted testimony still violates the spousal privilege. Finally, Bolin contends that to properly preserve the spousal privilege, this Court should reconsider its holding in Kerlin v. State, 352 So.2d 45 (Fla.1977), in which this Court found that observation of actions does not violate spousal privilege. These claims are without merit.
a. Crawford Claim
First, Bolin asserts that Coby’s testimony is so dated that it violates Crawford. The Sixth Amendment’s Confrontation Clause provides that “[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.” U.S. Const, amend. VI. In Crawford, the United States Supreme Court held that testimonial statements of a witness who did not appear at trial would not be admissible unless that witness was unavailable and the defendant *735 had a prior meaningful opportunity for cross-examination. Crawford, 541 U.S. at 68, 124 S.Ct. 1354; see § 90.804(2)(a), Fla. Stat. (2005). “In considering a trial court’s ruling on admissibility of evidence over an objection based on the Confrontation Clause, our standard of review is de novo.” McWatters v. State, 36 So.3d 613, 637 (Fla.2010) (quoting Milton v. State, 993 So.2d 1047, 1048 (Fla. 1st DCA 2008)).
Bolin contends that the cross-examination was not adequate to satisfy the requirement that he be given a meaningful opportunity to cross-examine Coby. See Davis v. Alaska, 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (noting that a primary interest of confrontation is the right of cross-examination). This claim is without merit. First, the Confrontation Clause guarantees only “an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.” State v. Ford, 626 So.2d 1338, 1347 (Fla.1993) (quoting Delaware v. Fensterer, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985)). Bolin was given a meaningful opportunity to cross-examine Coby during his first trial.
Furthermore, the record reflects that the cross-examination was in fact thorough and effective. Despite Bolin’s contention that the cross-examination focused only on the privileged communications that were redacted for the second retrial, the record reflects that counsel thoroughly cross-examined Coby regarding her testimony about her observations of Bolin’s actions, all of which was admitted during this trial. Cross-examination of Coby admitted during this trial included her status as legally blind, her difficulty deciphering between different colors, the fact that her observations were made while it was dark outside and the fact that she had such trouble seeing at night that she was unable to drive. Cross-examination included Coby’s strained relationship with her ex-husband Bolin, which existed on the night of the murder in question and continued to the day Coby testified in Bolin’s first trial, and the fact that Coby did not want Bolin spending time with their son. Cross-examination also elicited that Coby did not mention the wet knife in her prior depositions yet testified during the first trial that she saw the knife next to the sink in the trailer. Cross-examination also included the potential reward money from Crime Stoppers if Bolin was convicted, along with Coby’s medical bills and financial troubles, including her bankruptcy filing and having her vehicle repossessed in 1986. Cross-examination also included Coby’s concession that she never saw Collins with Bolin, and that Cheryl first lied to the investigating officers in 1990, stating that she knew nothing and after an hour and a half break agreed to talk with police. Based on the above, it is clear that Bolin not only received a meaningful opportunity to cross-examine Coby, but the cross-examination was in fact thorough.
Bolin contends that because of the years that have passed since Bolin’s first trial, admitting Coby’s testimony in his second retrial violates Crawford. However, Bolin provides no support for his assertion and we find it without merit. Cf. Murray v. State, 3 So.3d 1108, 1124 (Fla.2009) (testimony of witnesses was admissible at the fourth trial since the witnesses were unavailable for trial, issues were unchanged, and defendant had prior opportunity to cross-examine them).
Accordingly, we find that Coby’s redacted testimony does not violate Bolin’s right to confrontation.
b. Due Process
Bolin next asserts that admitting the redacted portion of Coby’s testimony regarding her observations on the night of *736 the murder violated Bolin’s due process because Coby’s observations were inextricably intertwined with the inadmissible privileged statements. Thus, Bolin asserts, even her redacted testimony violates spousal privilege. This claim is without merit.
Section 90.504 governs the Husband-wife privilege:
(1) A spouse has a privilege during and after the marital relationship to refuse to disclose, and to prevent another from disclosing, communications which were intended to be made in confidence between the spouses while they were husband and wife.
(2) The privilege may be claimed by either spouse or by the guardian or conservator of a spouse. The authority of a spouse, or guardian or conservator of a spouse, to claim the privilege is presumed in the absence of contrary evidence.
§ 90.504, Fla. Stat. (1985). In Kerlin, 352 So.2d at 51, this Court held that the privilege does not apply to observations made by the spouse. See also Bolin I, 650 So.2d at 23 (“The testimony of Bolin’s former spouse regarding her observations of Bo-lin’s alleged criminal activity was admissible and may be admitted in the new trial.”); Bolin II, 793 So.2d at 897, n. 3 (“The spousal privilege only applies to confidential communications. See § 90.504(1), Fla. Stat. (1985). Therefore, while Coby’s testimony regarding Bolin’s confidential statements to her is privileged, Coby’s testimony regarding what she witnessed is not privileged.”). The record is clear that Coby’s redacted testimony is not so intertwined with the privileged communications so as to render her entii’e testimony inadmissible. Moreover, the precedent set forth in Kerlin is still sound and Bolin provides no support for his assertion that this Court should reconsider its precedent.
Accordingly, the trial court did not err in admitting Coby’s redacted testimony.
II. Admission of Bolin’s Suicide Note
Based on prior attempted escapes and threats of kidnapping family members of the key police investigators while incarcerated, Bolin was placed in a one-man cell with constant supervision and his cell was routinely checked. On June 22, 1991, Bo-lin attempted suicide. Captain Terry was in charge of the Criminal Investigation Bureau Sheriffs Office which included the investigation of homicides. In this role, Captain Terry also responded to any suicides or suicide attempts at the jail which resulted in major injuries. Captain Terry investigated Bolin’s suicide attempt, including searching Bolin’s cell. During that search, he found a stamped envelope, face-up, addressed to Captain Terry, on top of a cardboard box, in plain view. Believing it a suicide letter, Captain Terry read the letter. The letter contained instructions to Captain Terry as to how to dispose of the cardboard box which held Bolin’s personal effects, as well as apologizing for his suicide. Prior to Bolin’s second retrial, the State filed a Motion to Admit Evidence that the Defendant Attempted to Commit Suicide, including the suicide letter addressed to Captain Terry. In accordance with the Second District’s decision in State v. Bolin, 693 So.2d 583 (Fla. 2d DCA 1997), the trial court granted the State’s motion over defense objection. See generally Florida Dep’t of Transp. v. Juliano, 801 So.2d 101, 106 (Fla.2001) (recognizing that “[ujnder the law of the case doctrine, a trial court is bound to follow prior rulings of the appellate court as long as the facts on which such decision are based continue to be the facts of the case”); Henry v. State, 649 So.2d 1361, 1364 (Fla.1994).
*737 Bolin contends that the trial court erred in admitting the suicide note. Specifically, Bolin contends that Terry illegally seized Bolin’s private property in violation of the Fourth Amendment. Bolin also contends that because he was represented by counsel at the time of the suicide attempt, opening the letter was in violation of his Sixth Amendment right to counsel. These claims are without merit.
To establish a Fourth Amendment violation, an individual must have a subjective expectation of privacy that society recognizes is reasonable. Minnesota v. Olson, 495 U.S. 91, 95-96, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). The United States Supreme Court has held that society is not prepared to recognize that a prisoner has a legitimate, subjective expectation of privacy in his or her cell and so “the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell.” Hudson v. Palmer, 468 U.S. 517, 526, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Bolin contends that he was merely a pretrial detainee. However, this assertion ignores the fact that while Bolin was awaiting trial on the instant murder charge, he was serving two consecutive sentences based on his Ohio conviction for the rape and kidnapping of Jennifer LeFevre. Hence, he was not merely a pretrial detainee.
Bolin attempts to rely on the “plain-view” doctrine, asserting that the investigators were not justified in seizing his letter because the envelope itself did not establish probable cause that the letter was contraband; they would need to open and read the letter before realizing it was “contraband.” See Minnesota v. Dickerson, 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (stating that if an object’s incriminating character is not “immediately apparent” or if there is not probable cause to believe an object is contraband without a further search, the “plain-view” doctrine cannot justify its seizure). However, such a doctrine relies on the application of Fourth Amendment search and seizure protections. Based on the circumstances under which Bolin was monitored, the daily searches of his cell, and his suicide attempt, there was no reasonable expectation of privacy within Bo-lin’s prison cell which would trigger the Fourth Amendment protections against this action. Furthermore, the officers had a justified reason to search Bolin’s cell which would outweigh any Fourth Amendment protection.
Bolin contends that his constitutional rights were violated because the search was conducted merely to bolster the State’s case against the detainee and was not conducted for security reasons. See United States v. Cohen, 796 F.2d 20, 23 (2d Cir.1986). The record conclusively refutes this allegation. The search and seizure of the letter in question carried out after an attempted suicide was based on the prison’s policy to investigate such an attempt where serious injury occurred. The letter was placed in a prominent position on top of Bolin’s box of personal possessions, face up, addressed to Captain Terry, and stamped. The letter was seized and read after Bolin attempted suicide because it appeared to be, and was indeed, a suicide note. Accordingly, the officers did not violate Bolin’s Fourth Amendment rights by seizing this letter.
Bolin asserts that seizure of the letter violated his Sixth Amendment right to counsel. Once a defendant has asserted his right to counsel, “the State may not initiate any crucial confrontation with the defendant on that charge in the absence of counsel throughout the period of prosecution.” Traylor v. State, 596 So.2d 957, 968 (Fla.1992). Bolin asserts that the State initiated contact by perusing Bolin’s pa *738 pers in the absence of his counsel. According to Bolin, this should be considered a crucial confrontation with the defendant and the State used the suicide attempt as a fishing expedition while Bolin was in the hospital. Bolin concedes that the letter contained no work product of defense counsel, but asserts that the box containing his personal effects could have included materials relating to his trial preparation. At the least, Bolin requests this Court to order an evidentiary hearing for such a determination. According to the evidence presented, the letter was not in the box, but on the top of the box. Bolin does not address why the letter should be suppressed because his box of personal effects could have contained attorney-client privileged information. Bolin fails to address how seizing the letter during an investigation of Bolin’s suicide attempt could constitute a crucial confrontation with the defendant himself. Moreover, as Traylor makes clear, the confrontation must concern the charge at issue. In this ease, the officers seized the letter in conjunction with a suicide investigation; they were not initiating contact with Bolin in regards to the murder charge he faced.
Accordingly, the trial court did not err in admitting the suicide letter.
III. Sufficiency of the Evidence
This issue was not briefed by the parties; however, this Court has a mandatory obligation to independently review whether there is sufficient evidence to support a first-degree murder conviction. Miller v. State, 42 So.3d 204, 227 (Fla.2010) (citing Blake v. State, 972 So.2d 839, 850 (Fla.2007)), cert, denied, — U.S. -, 131 S.Ct. 935, 178 L.Ed.2d 776 (2011); Fla. R.App. P. 9.142(a)(6). In conducting this review, we “view the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Rodgers v. State, 948 So.2d 655, 674 (Fla.2006) (citing Bradley v. State, 787 So.2d 732, 738 (Fla.2001)). “Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to ldll. This purpose may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act.” Bradley, 787 So.2d at 738 (quoting Woods v. State, 733 So.2d 980, 985 (Fla.1999)). Premeditation may be inferred from such facts as “the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.” Id. (quoting Norton v. State, 709 So.2d 87, 92 (Fla.1997)).
Here, there is sufficient evidence to support a conviction for first-degree murder. On November 5, 1986, Stephanie Collins went missing after stopping by the Eckerd’s Drug Store where she worked. On December 5, 1986, Collins’s decomposed body was found in a ditch off of Morris Bridge Road in Tampa. Collins’s mother identified the clothes Collins was wearing on the day her body was discovered as the same clothes she was wearing on the day she went missing. Her body was wrapped in sheets and a quilt. Inside the quilt there were sheets and a towel with a hair on it. DNA analysis revealed that the DNA on the hair matched the DNA of Bolin. One of the sheets in which Collins’s body was wrapped had “Hospital Property” written on it. Law enforcement also found Collins’s purse near her body. The purse contained a piece of paper on which “724-BYL, Ray” was written. Testimony during trial provided that Bolin was usual *739 ly called Ray and 724-BYL was the tag number of Bolin’s pickup truck.
In July, 1990, detectives located Bolin’s ex-wife, Cheryl Coby, in Indiana, in response to her then-husband, Danny Coby, calling the Crime Stoppers Hotline and stating that she knew about the Collins murder. Before Coby died in 1992, Coby’s testimony was recorded during Bolin’s first trial, during which she testified that in November of 1986, Bolin, her husband at the time, came to the Waffle House where she was having dinner with friends and insisted she leave with him. She testified that they returned to their trailer, and Bolin left her in the truck and went inside for about ten to fifteen minutes. Coby heard the trailer door open and saw Bolin pick up something wrapped in a quilt. He put the quilt in the back of the truck. She identified the quilt, sheets, and towel found with Collins’s body as belonging to her and Bolin. Coby testified that she would take the hospital sheets from the hospital when she stayed there because of her recurring health problems due to diabetes. Coby provided detectives in Indiana with hospital sheets just like the one found wrapped around Collins’s body. Coby testified that she and Bolin drove to Morris Bridge Road, where she watched Bolin dump a body in a ditch. Coby testified that when she and Bolin returned to their trailer, Coby saw spots of blood on the curtains, walls, carpet, and blinds. She also testified that the floor, ceiling, cabinets, and doors were wet. She testified that she saw a butcher knife, that was usually kept in a drawer, beside the sink and the handle was wet.
Hennie Moss and David Fessler testified during trial that they saw Collins in a white van with a man they could not identify on the afternoon she went missing. They testified that Collins was acting excited and waving her arms. Michael Long, a friend of Coby and Bolin, testified that he had seen Bolin use a white van years before and that Bolin’s friend allowed Bo-lin to borrow it.
The medical examiner, Dr. Peter Lardi-zabal, testified that Collins’s skull was struck several times so hard that parts of her skull were reduced to powder. The medical examiner testified that there were twenty-eight fragments of the victim’s skull as a result of the blunt force trauma Collins sustained. The medical examiner could identify nine points of impact on her skull and testified that the blows would have been quickly fatal. The medical examiner also testified that Collins’s body and clothes revealed that there were six stab wounds to her back; however, due to the decomposition of her body, the medical examiner was unable to determine whether the stab wounds were made while Collins was alive or postmortem.
Accordingly, there was sufficient evidence that Bolin committed the homicide with “a premeditated design to effect the death of the person killed[.]” See § 782.04(l)(a)l, Fla. Stat. (1985).
Penalty Phase Claims
I. Statutory Mental Mitigation
Bolin asserts that the trial court erred in not finding the statutory mitigator of “[t]he capacity of the defendant to appreciate the criminality of his [or her]” conduct or to conform his [or her] conduct to the requirements of law was substantially impaired. See § 921.141(6)(f), Fla. Stat. (1985). Bolin asserts that if the trial court had found this statutory mental mitigator, the death sentence would be disproportionate. We find this claim without merit.
The State asserts that this claim is not preserved for review because Bolin waived his right to present mitigation. While Bolin waived his right to a penalty phase jury, we find that he did not waive *740 his right to present mitigation altogether. Rather, Bolin presented a mitigation notebook, which included .mitigation evidence admitted in his prior penalty phase trials: (1) Dr. Beriand’s testimony from the prior penalty phase; and (2) Mary Baughman and Sherry Jauregui’s (Bolin’s mother and sister) prior penalty phase testimonies. The trial court accepted the mitigation notebook into evidence and considered it in determining Bolin’s sentence. The trial court also considered the Pasco County sentencing order for Bolin’s conviction for the murder of Teri Lynn Mathews that provided potential mitigation. Additionally, the Spencer hearing was continued so that Bolin could have a PET scan, and during the Spencer hearing, on October 29, 2007, the defense proffered evidence from Dr. Wood and Dr. Burdette regarding Bo-lin’s mental status. The trial court accepted and relied on this mitigation in determining Bolin’s sentence.
Bolin contends that the trial court erred in rejecting the statutory mental mitigator that “[t]he capacity of the defendant to appreciate the criminality of his [or her] conduct or to conform his [or her] conduct to the requirements of law was substantially impaired.” See § 921.141(6)©, Fla. Stat. (1985). “Mitigating evidence must be considered and weighed when contained ‘anywhere in the record, to the extent it is believable and uncontroverted.’ ” LaMarca v. State, 785 So.2d 1209, 1215 (Fla.2001) (quoting Robinson v. State, 684 So.2d 175, 177 (Fla.1996)). Nevertheless, the sentencer is not precluded from according the mitigating factor no weight. Trease v. State, 768 So.2d 1050, 1055 (Fla.2000). The trial court must find a mitigating circumstance if it “has been established by the greater weight of the evidence.” Coday v. State, 946 So.2d 988, 1003 (Fla.2006). “However, a trial court may reject a proposed miti-gator if the mitigator is not proven or if there is competent, substantial evidence to support its rejection.” Id.
Bolin contends that Dr. Beriand’s uncontroverted testimony supports the finding of this mental mitigator. Trial judges have broad discretion in considering unrebutted expert testimony; however, the rejection of the expert testimony must have a rational basis. Id. at 1005. In Foster v. State, 679 So.2d 747, 755 (Fla.1996), this Court stated that “[e]ven uncon-troverted opinion testimony can be rejected, especially when it is hard to reconcile with the other evidence presented in the case.” Accord Coday, 946 So.2d at 1005; Morton v. State, 789 So.2d 324, 330 (Fla.2001).
In the instant case, the trial court found that the defense did not establish the existence of this mitigating circumstance and gave it no weight. We find that the trial court considered all the evidence that was presented by both sides and that competent, substantial evidence supports the trial court’s rejection of this proposed mitigator. Dr. Berland testified that Bolin suffered from a number of mental illnesses; however, aside from Dr. Ber-iand’s conclusory statement that Bolin’s illnesses could have rendered Bolin unable to conform his conduct to the requirements of law, there was no evidence submitted that linked these illnesses to the events of the night of Collins’s murder. Dr. Berland acknowledged that Bolin was capable of recognizing the criminality of his conduct, but opined that his mental illnesses would have made his impulses to commit the crime very hard to control. On cross-examination by the State, Dr. Berland acknowledged “the psychosis seems to be not in any way a controlling — no voice told him to do whatever he did. On the other hand, it seems to be a significant factor that simply can’t be ignored.” While Dr. Ber- *741 land testified that such symptoms lasted a lifetime, he also testified that the symptoms would wax and wane throughout time, and testified that Bolin could control his impulses at certain times but perhaps not at others. Because Bolin did not discuss the events of the night of Collins’s murder with Dr. Berland, Dr. Berland could not specifically testify to whether such psychosis affected Bolin that night. Based on this testimony, although Bolin may suffer from mental illness, there is no evidence to support the conclusion that such illness affected Bolin during the events of Collins’s murder. Therefore, the trial court’s rejection of this statutory miti-gator is supported by competent, substantial evidence.
Accordingly, we find that the trial court did not err in rejecting the proposed statutory mental mitigator.
II. Proportionality
Bolin contends that his death sentence is not proportional. “[T]o ensure uniformity in death penalty proceedings, 'we make a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.’ ” Floyd v. State, 913 So.2d 564, 578 (Fla.2005) (quoting Anderson v. State, 841 So.2d 390, 407-08 (Fla.2003)). This Court has described its “proportionality review” as involving “a thoughtful, deliberate proportionality review to consider the totality of circumstances in a ease, and to compare it with other capital cases.” Tillman v. State, 591 So.2d 167, 169 (Fla.1991) (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990) (emphasis omitted)). “This entails ‘a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.’ In other words, proportionality review ‘is not a comparison between the number of aggravating and mitigating circumstances.’ ” Offord v. State, 959 So.2d 187, 191 (Fla.2007) (citations omitted).
In the instant case, Bolin was convicted of the first-degree murder of Stephanie Collins. The trial court found one aggra-vator: (1) previously convicted of another capital felony or of a felony involving the use or threat of violence to the person-great weight. In mitigation, the sentencing court found: (1) age of defendant at time of crime (24) — little weight; and (2) the following statutory catch-all mitigator of any other factors in the defendant’s background that would mitigate against imposition of the death penalty: (a) defendant suffered from the effects of his mother’s alcoholism and his own substance abuse — little weight; (b) defendant was abused as a child — some weight; (c) defendant had a poor and unstable childhood — little weight; (d) defendant had sporadic minimal education — little weight; (e) defendant received his GED while incarcerated — little weight; (f) defendant developed skills which included welding, electrical, plumbing, and small machinery skills — little weight; (g) defendant saved the life of another — little weight; (h) defendant was gainfully employed at the time — little weight; (i) defendant behaved appropriately at trial — little weight; (j) defendant has adapted to institutional living and had not received any disciplinary reports — little weight; (k) defendant has been married for eleven years and he seems to maintain that relationship, considering the obvious limitations — little weight; and (l) defendant’s physical and mental medical history indicates several problems — little weight. Additionally, the trial court gave some weight to a finding of some mental or emotional disturbance.
This Court has previously explained that “absent unusual circumstances, ‘death is *742 not indicated in a single-aggravator case where there is substantial mitigation.’ ” Green v. State, 975 So.2d 1081, 1088 (Fla.2008) (quoting Almeida v. State, 748 So.2d 922, 933 (Fla.1999)). “The vast majority of cases where we have upheld a death sentence based on a single aggravator have involved a prior murder or manslaughter.” Id.
This Court has previously stated that the prior violent felony aggravator is one of the “most weighty” aggravating circumstances set forth in Florida’s statutory sentencing scheme. See Bevel v. State, 983 So.2d 505, 524 (Fla.2008); Sired v. Moore, 825 So.2d 882, 887 (Fla.2002). Additionally, the underlying facts supporting the statutory aggravator in this case are particularly heinous, including: (1) a December 28, 2001, conviction for first-degree murder in Pasco County for the murder of Teri Lynn Mathews, for which Bolin was sentenced to death; (2) a 1988 kidnapping and rape conviction for Bolin’s rape of Gennie Lefever at gunpoint; and (3) a 1988 conviction for felonious assault and escape while incarcerated for the above-mentioned rape, for which Bolin pleaded guilty. Additionally, the mitigation was of insubstantial effect, to which the trial court allocated little or some weight. We find that the death sentence is proportional in this case. See, e.g., Rodgers, 948 So.2d at 671-72 (finding the death sentence proportionate even though it was supported by a single aggravator — prior violent felony conviction — where that aggravator included a robbery and a similar shooting and killing offense balanced against insubstantial mitigation); Ferrell v. State, 680 So.2d 390, 391 (Fla.1996) (affirming death sentence where sole aggravator was prior second-degree murder and insubstantial mitigation); Duncan v. State, 619 So.2d 279, 284 (Fla.1993) (affirming death sentence where sole aggravator was prior second-degree murder); Lemon v. State, 456 So.2d 885, 888 (Fla.1984) (death proportionate for defendant who killed a woman with whom he had a relationship after a previous conviction for a similar violent offense), cert. denied, 469 U.S. 1230, 105 S.Ct. 1233, 84 L.Ed.2d 370 (1985).
CONCLUSION
Based on the foregoing, we affirm Bo-lin’s conviction and sentence of death.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, CANADY, LABARGA, and PERRY, JJ., concur.
QUINCE, J., recused.

. Prior to Bolin's first retrial, Bolin moved for the suicide letter to be suppressed. After an evidentiary hearing, the trial court granted his motion. The State took an interlocutory appeal to the Second District Court of Appeal, which reversed the trial court's ruling. State v. Bolin, 693 So.2d 583 (Fla. 2d DCA 1997). Specifically, the district court held that based on the factual circumstances, Bolin did not have a reasonable expectation to privacy in the letter. This Court declined to grant discretionary review of the district court's decision. Bolin v. State, 697 So.2d 1215 (Fla.1997) (table decision). The United States Supreme Court denied Bolin’s petition for a writ of certiorari. Bolin v. Florida, 522 U.S. 973, 118 S.Ct. 427, 139 L.Ed.2d 328 (1997) (table decision).

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. A technological issue with the videotape recorder did not allow the entirety of Coby's testimony to be videotaped.