# Supreme Court of Florida

_____

No. SC17-2244
_____

**RAYMOND BRIGHT,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

April 2, 2020

PER CURIAM.

In 2009, Raymond Bright was convicted of the first-degree murders of

Derrick King and Randall Brown and sentenced to death for each murder. This

Court affirmed the convictions and sentences on direct appeal. *Bright v. State*

*(Bright I)*, 90 So. 3d 249, 265 (Fla. 2012). In subsequent postconviction

proceedings, Bright was granted a new penalty phase proceeding on the basis that

his trial counsel rendered ineffective assistance in investigating and presenting

mitigating evidence. *State v. Bright (Bright II)*, 200 So. 3d 710, 736 (Fla. 2016).

Bright now appeals from the second penalty phase at which a death sentence was

imposed for each murder following jury verdicts unanimously recommending

death.  We have jurisdiction.  *See* art. V, § 3(b)(1), Fla. Const.  For the reasons that follow, we affirm the sentences.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### Trial and Direct Appeal

This Court previously set forth the relevant facts in *Bright I*:

> On February 18, 2008, Michael Majors went to the home of fifty-four-year-old defendant Raymond Bright in Jacksonville, Florida.  Twenty-year-old Derrick King, sixteen-year-old Randall Brown, and Bright were in the house.  At approximately 8 p.m., Majors and Brown both left the home.
>
> Brown returned to his mother's home and, after receiving a phone call, borrowed his mother's rental vehicle and left her house between 9 and 9:30 p.m.  At approximately 11 p.m., Brown spoke with his mother by phone and advised that he would be home shortly; however, he never returned.  At around 8 a.m. the next morning, Majors attempted to call Brown on his cellular phone, but there was no answer.  Majors called Brown's mother and was advised that Brown had not returned.  Majors then went to Bright's house and, having no response to his knock at the door, Majors climbed into the house through an open window.  Upon entering the family room, Majors discovered the bodies of King and Brown.
>
> Derrick King was lying face down on the carpet next to a sofa, partially wrapped in a sleeping bag or comforter.  The sofa was saturated with blood on one end, which was adjacent to where King's head rested on the floor.  The wall behind the sofa and the ceiling above the sofa evidenced blood.  An evidence technician testified during trial that the blood on the ceiling was cast-off blood, [n.1] and the pattern was consistent with someone being on the couch and swinging his arm back.
>
> > [N.1] Cast-off blood is defined as droplets of blood that are flung from a weapon so as to make a trail of blood where it lands.

Randall Brown was found seated sideways in a recliner with his head leaning up against a wall and a blanket covering his head. The wall against which Brown's body rested presented a pattern of blood that radiated from his head, and there was also blood on the ceiling. When crime scene technicians moved the recliner away from the wall, a pool of blood was discovered on the floor. Above Brown's head was a framed picture with one side of the frame broken away. That one side was indented, consistent with having been struck by something round, such as a hammer.

Outside the house, the crime scene technicians located a loaded nine-millimeter Smith & Wesson pistol, a loaded assault rifle, and a pair of mechanic's gloves. During a subsequent search of Bright's yard, technicians recovered a hammer that had been buried. DNA testing on the hammer revealed two separate DNA profiles, one of which was a major contributor and the other of which was a minor contributor. During trial, the parties stipulated that the DNA of the major contributor matched the known profile of Derrick King. Randall Brown could not be excluded as the minor contributor. The gloves did not test positive for blood. Further, no latent fingerprints of value were found on the hammer, the nine-millimeter handgun, the assault rifle, or their magazines or ammunition. No foreign DNA was detected on the fingernail clippings of either victim.

At 7:30 a.m. on the morning of February 19 (the day that the victims were discovered), Bright's ex-wife picked him up at a church near his home. The ex-wife testified that she and Bright had made plans to secure the admission of Bright to a United States Department of Veterans Affairs clinic for treatment of his cocaine addiction. She testified that they had agreed to meet at the church because she "was in fear of what was going on" at Bright's house. During the *Spencer* hearing, *see Spencer v. State*, 615 So. 2d 688 (Fla. 1993), the ex-wife testified that she and Bright had previously made multiple calls to law enforcement—including the narcotics division of the Jacksonville Sheriff's Department and Crime Stoppers—to report that Bright wanted certain individuals removed from his house because they had essentially taken over the house for the purpose of selling drugs. While one officer suggested that Bright accompany the police to the house and identify the persons who were allegedly dealing drugs,

Bright and his ex-wife refused to agree to this proposal because they feared retaliation. [n.2]

> [N.2] Bright's sister, Janice Jones, also testified during the *Spencer* hearing as to her efforts to remove individuals who were staying in Bright's house. When asked what their names were, she replied Lavelle and Derrick. During the guilt phase, Michael Majors testified that Bright rented a room to an individual named Lavelle Copeland, who was friends with Majors and King. Jones managed to convince Copeland to call her and, when he called, she informed him that she was coming to Jacksonville and would bring the police with her. Copeland responded that he would not leave until Bright paid the money owed to him. When Jones offered to pay the money so that Copeland would leave the house, he responded, "You need to stay out of this. You don't know what you're getting into. It's between me and your brother." Copeland was not at Bright's house on the night of the murders because he was in jail.

After the ex-wife met Bright at the church on the morning of February 19, she called a lawyer and arranged for Bright to speak with homicide detectives the next day. However, at 1:45 a.m. on February 20, law enforcement arrived at the home of the ex-wife and Bright was placed in custody. Subsequent to the arrest, the ex-wife disposed of Bright's bloody clothes because she did not want them in her house.

Bright made statements to separate individuals with regard to what allegedly occurred on the night of the murders. Prior to his arrest, Bright informed friend and former coworker Benjamin Lundy that he had "screwed up" and may have killed two people. Bright told Lundy that the murders occurred after a confrontation erupted when one of the victims accused Bright of stealing drugs. After his arrest, Bright also described the events to Mickey Graham, who was in jail at the same time with Bright on unrelated charges. According to Graham, Lavelle Copeland had moved in with Bright, and he and others were running a crack cocaine operation out of the house. [n.3] Bright was afraid of them and felt threatened because they possessed

- 4 -

guns. Bright did not want them there and had called the police in an attempt to remove them from the premises.

[N.3] On a table in the home, an evidence technician found scales, money, and a "push rod," which is used to pack drugs into a pipe or a bong. However, no drugs were found in the house other than 4.6 grams of marijuana, which was discovered inside Derrick King's sneaker.

Bright told Graham that he went into the kitchen at 2 a.m. on February 19. King was on the sofa and Brown was in the recliner. Brown had a nine-millimeter handgun in his hand and started waving it around. King rose from the sofa and removed the gun from Brown's hand. Bright saw an opportunity and attempted to take the gun away from King. The men struggled and the gun discharged. [n.4] The gunshot startled King and caused him to release the handgun. Bright then pointed the gun at King and attempted to shoot him, but the gun misfired. Bright dropped the weapon and attempted to run out of the house, but he tripped and fell. He grabbed a hammer that was within reach, turned around, and commenced striking King, knocking him back toward the sofa where King had previously been lying down. When Bright turned around, he saw that Brown was about to pick up the handgun. Bright then began to strike Brown with the hammer. The next time Bright turned toward the sofa, he saw King reaching for an assault rifle. At that time, Bright again struck King with the hammer. When Bright stopped, he could still hear King and Brown breathing and gurgling, but then the room became silent. Bright described his actions to Graham as having "lost it."

[N.4] In the vicinity of King's body was a section of carpet that appeared to be stained with gunshot residue. Testing on the carpet was positive for gunshot residue, and a firearms expert testified that, based upon the location of the residue, a weapon had been fired within six inches of the carpet. From that stain, the evidence technicians traced a bullet trajectory and ultimately discovered a bullet lodged in the wall near the front door of the house. However, neither of the victims' hands tested positive for gunshot residue. A firearms

- 5 -

expert confirmed that the bullet lodged in the wall had been fired from the nine-millimeter handgun that had been discovered in the yard.

90 So. 3d at 252-54. The jury found Bright guilty of two counts of first-degree murder and ultimately recommended a sentence of death for the murders of King and Brown by a vote of eight to four. *Id.* at 256. After conducting a *Spencer*[1] hearing, the trial court found the same aggravating and mitigating circumstances for each victim and concluded that the established aggravating[2] factors substantially outweighed the mitigating[3] circumstances. 90 So. 3d at 256-57. The

---

1. *See Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

2. The trial court determined that the State had proven beyond a reasonable doubt the following statutory aggravators: (1) previous conviction of a felony involving the use or threat of violence to the person (a 1990 conviction for robbery) (great weight); (2) previous conviction of a felony involving the use or threat of violence to the person (the contemporaneous murder of the other victim) (great weight); and (3) the murder was especially heinous, atrocious, or cruel (HAC) (great weight). 90 So. 3d at 256-57.

3. The trial court found one statutory mitigating circumstance—that the murders were committed while Bright was under the influence of an extreme mental or emotional disturbance (some weight). The trial court also found nineteen nonstatutory mitigators:

(1) a long and well-documented history of drug abuse (some weight); (2) Bright repeatedly sought help for his problems (some weight); (3) remorse (little weight); (4) Bright was afraid of the victims and took steps to remove them from his house (little weight); (5) ten years of service in the USMC with two honorable discharges and a third discharge under honorable circumstances (considerable weight); (6) Bright has skills as a mechanic and served as an aviation mechanic in the USMC (some weight); (7) Bright's actions as a USMC aviation

- 6 -

trial court sentenced Bright to death. *Id.* at 257. On direct appeal, this Court

affirmed the convictions and sentence. *Id.* at 265. The United States Supreme

Court denied Bright's petition for writ of certiorari. *Bright v. Florida*, 568 U.S.

897 (2012).

## Postconviction Proceeding

On November 6, 2013, Bright filed an amended motion to vacate his

judgment and sentences pursuant to Florida Rule of Criminal Procedure 3.851. In

his motion, Bright claimed that his trial counsel were ineffective during the guilt

and penalty phases of his trial and that he was deprived of a fair trial by the

cumulative effect of any errors. *Bright II*, 200 So. 3d at 722. After conducting an

evidentiary hearing, the postconviction court held that Bright's penalty phase

---

mechanic likely saved lives (some weight); (8) Bright mentored
young mechanics (some weight); (9) Bright was a good employee
(some weight); (10) Bright was a loving and giving boyfriend (slight
weight); (11) Bright is a good brother (some weight); (12) Bright was
a good father, and imposition of the death penalty would have a
serious, negative impact on others (slight weight); (13) Bright shares
love and support with his family (slight weight); (14) Bright was a
good friend (slight weight); (15) Bright has been an exceptional
inmate (some weight); (16) Bright exhibited good behavior
throughout the court proceedings (slight weight); (17) Bright
maintained gainful employment (considerable weight); (18) Bright is
amenable to rehabilitation and a productive life in prison (slight
weight); and (19) Bright has bonded with another inmate and taught
him how to read (slight weight).

90 So. 3d at 257.

- 7 -

counsel were ineffective but denied Bright's remaining claims. *Id.* at 723. The postconviction court entered an order granting Bright a new penalty phase. *Id.* The parties cross-appealed the order.

This Court affirmed the postconviction court's order granting a new penalty phase,[4] holding that there was competent, substantial evidence to support the trial court's findings that penalty phase counsel were deficient in investigating mitigation evidence concerning Bright's mental health and that Bright was prejudiced by that deficient performance. *Id.* at 732-36. This Court remanded for a new penalty phase proceeding. *Id.* at 742.

## Second Penalty Phase Proceeding

The second penalty phase proceeding began on September 5, 2017. The State presented much of the same guilt-phase evidence through live witness testimony, including Brown's mother, Carrie Mae Brown Gray; Brown's friend, Michael Majors; and police officers and crime scene investigators from the Jacksonville Sheriff's Office. Victim impact statements were read by King's grandmother, Eartha Jaudon; Brown's mother, Gray; Brown's sister, Shannon Brown; and King's mother, Carolyn Jaudon. Retired Pensacola Police Department Sergeant Robert Bell testified that on September 6, 1989, he witnessed Bright

---

4. This Court also affirmed the denial of Bright's claims that guilt-phase counsel were ineffective. 200 So. 3d at 737, 742.

holding a knife while robbing a convenience store clerk. Specifically, Bell testified that he saw Bright "standing on the side of the counter, holding the knife, leaning over the counter like he was attempting to get money out of the register." Bright ran from the store but was eventually caught and arrested. The State introduced a copy of the conviction, judgment, and sentence from 1990.

The State's final witness was Dr. Valerie Rao, the Chief Medical Examiner for Clay, Nassau, and Duval Counties. With regard to Brown, Dr. Rao testified that his cause of death was blunt head trauma. He had more than fourteen injuries to the outside of his head, which included lacerations, bruises, contusions, and fractures. The fourteen injuries did not include the skull fractures or brain injuries. Dr. Rao testified that the lacerations on Brown's head and skull fractures were consistent with a hammer being used to inflict the injuries. Brown had many defensive injuries, including a fracture of his left ulna, punctate-type lacerations to his left arm, and injuries to his wrists, hands, and thigh. Brown also suffered multiple skull fractures. Dr. Rao also testified that Brown was alive when the injuries were inflicted, as evidenced by the bruising and swollen face.

With regard to King, Dr. Rao testified that King also died from blunt impact to the head. He had thirty-eight blunt impact injuries to his head and about twenty injuries to his extremities. King suffered a laceration through the upper eyelid above the right eyebrow, through the left eye. His eye was sunken because of the

trauma. One injury on his head went through his scalp to reveal his underlying skull; the injuries on his head showed a parallel pattern received from a claw impacting and dragging. King also had circular fractures that caused multiple injuries to his brain and bleeding on the surface of his brain. These injuries were consistent with being caused by a hammer. Dr. Rao also testified that King was alive when these injuries were inflicted and that he suffered. King was covered with numerous defensive wounds: bruising on his left arm; a fracture of his left ulna; abrasions and bruising of the entire back of his left hand; bruising and abrasions on his right forearm and back of his right hand; and an abrasion and laceration on his left knee. On redirect, Dr. Rao also testified that King and Brown were not unconscious after one blow because each individual had defensive wounds.

The defense then presented its case for mitigation. The first witness for the defense was Janice Jones, Bright's sister. Jones testified regarding her and Bright's impoverished childhood. She also testified that Bright was abused by their father during his childhood. Their father would hit Bright two or three times a week with items from the junkyard where they lived. Additionally, at least twice a month, their father would administer hours-long planned beatings, which were for previously unpunished wrongs that the father would add-up. Bright's father would beat him to the point of drawing blood, and sometimes losing

consciousness. During the beatings, the father would lecture them from the Bible. Bright was also beaten for stuttering and wetting his bed. Bright's father ran a junkyard that surrounded their house. As children, both Jones and Bright were forced to work in the junkyard from the time the sun rose until dark. Jones also testified that she and Bright witnessed their father abuse their mother and that their father would frequently binge drink alcohol.

Jones also testified about Bright joining the United States Marine Corps and training to be an aircraft mechanic. When Bright returned from the military, Jones noticed him struggling with alcohol. She also noticed him having problems with other substances in 1989. She helped Bright participate in a thirty-day treatment program with the Veterans Administration, but he struggled after the program was over.

In November of 2007, three months before the murders, Jones saw Bright and believed he was depressed. Jones testified that shortly before the murders she tried unsuccessfully to get individuals who were residing in Bright's house to leave. After failing to get the individuals out of Bright's house, Bright seemed to be in distress and in fear. Finally, Jones testified that Bright has taken care of her and her children and that they have a positive relationship. Bright also has a positive relationship with his grandchildren and Jones's grandchildren.

Bright's childhood friend and neighbor, Isidore Knight, also testified. Knight grew up across the street from Bright and remembers that Bright had to work in the junkyard from the age of six or seven, from sunup to sundown, six days a week. Bright worked even when injured. Knight saw Bright get "whipped" with an extension cord as punishment and characterized Bright's childhood as "torture."

Psychologist Dr. Harry Krop testified regarding an assessment and testing done for Bright's original penalty phase. Dr. Krop saw Bright in August of 2008 to assess Bright's competency to proceed to trial and again in July of 2009. Dr. Krop found Bright competent. His testing revealed no signs of psychopathy or malingering. Bright appeared highly anxious, situationally depressed and reported having panic attacks. Dr. Krop did not diagnose Bright with Post Traumatic Stress Disorder (PTSD).

The defense also presented the testimony of Dr. Steven Gold, a psychologist and expert in trauma psychology who interviewed Bright in 2013. Dr. Gold evaluated Bright using risk factors set forth in the Adverse Childhood Experience Study (ACES). ACES identifies ten adverse childhood experiences, or factors. The greater the number of factors a person has in his or her background the higher the rate of psychological and medical problems. Bright experienced all ten ACES factors. Dr. Gold diagnosed Bright with PTSD as a result of his childhood abuse.

Dr. Gold testified that PTSD played a role in this case. Specifically, Gold testified that Bright felt threatened and in constant danger in his home as a child and that Bright's childhood related to the murders because two men had entered Bright's home, destroyed it, and refused to leave. Dr. Gold stated that Bright felt in danger over a period of days or weeks before the murders and opined that Bright killed King and Brown while he was under the influence of extreme mental or emotional disturbance. He also opined that Bright's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.

Finally, the defense presented the testimony of Dr. Robert Ouaou, a neuropsychologist. Dr. Ouaou evaluated Bright in 2014. Dr. Ouaou stated Bright suffered from severe emotional distress as a result of his abusive parents. Dr. Ouaou did not diagnose Bright with PTSD and did not find Bright to have a cognitive disability. Dr. Ouaou acknowledged that Bright's military discharge was related to his alcohol problem and that after his discharge, he developed a drug addiction.[5]

---

5. Concerning Bright's military career, the defense presented the testimony of James Hernandez, an attorney and retired Marine. Hernandez testified, as he did in Bright's first penalty phase proceeding, regarding Bright's personnel records for the time Bright served in the Marine Corps. Hernandez testified that during his career in the Marines, Bright received two awards for good conduct. Bright also received an award called a Meritorious Mast when, while working as a fighter jet mechanic, he observed a mechanical difficulty with an aircraft upon take-off and

After closing arguments and deliberations, the jury returned a verdict for each victim—King (Count I) and Brown (Count II)—unanimously recommending that Bright be sentenced to death. As to King, the jury unanimously found that two aggravators were proven beyond a reasonable doubt: (1) Bright was previously convicted of a capital felony or a felony involving the use or threat of violence to a person; and (2) the murder was especially heinous, atrocious, or cruel. With regard to mitigators, by a vote of eleven to one, the jury rejected the statutory mitigator that the murder was committed while Bright was under the influence of extreme mental or emotional disturbance. The jury also unanimously rejected the statutory mitigator that the capacity of Bright to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. By a vote of eleven to one, the jury rejected the mitigator that there existed any other factors in Bright's character, background, or life or the circumstances of the offense mitigating against the imposition of the death penalty.[6] The jury

_____

relayed to the pilot to come down. Bright's actions prevented a "tragic mishap." On his last period of active service, Bright received a "general under honorable conditions" discharge "by reason of alcohol rehab failure." The defense also presented the testimony of attorney Michael Bossen, who testified that Bright's ex-wife, Bridgett Bright, contacted him early in the morning of February 19, 2008. He spoke with both Bridgett and Bright on the phone, and Bright was despondent and cried. When Bossen met Bright the next day at his first appearance, Bright was very despondent and could not communicate at all.

unanimously found that the aggravating factors were sufficient to warrant a sentence of death and that those factors outweighed the mitigating circumstances. Ultimately, the jury unanimously found that Bright should be sentenced to death for the murder of King.

As to Brown, the jury unanimously found the aggravator that Bright was previously convicted of a capital felony or a felony involving the use or threat of violence to a person was proven beyond a reasonable doubt. However, unlike King, the jury did not find that the murder was especially heinous, atrocious, or cruel. By a vote of eleven to one, the jury rejected each of the following statutory mitigators: (1) that the murder was committed while Bright was under the influence of extreme mental or emotional disturbance; (2) that the capacity of Bright to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and (3) that there existed any other factors in Bright's character, background, or life or the circumstances of the offense mitigating against the imposition of the death penalty. The jury unanimously found that the aggravating factors were sufficient to warrant a sentence of death and that those factors outweighed the mitigating circumstances.

---

6. Bright requested one finding as to this catch-all provision and therefore the jury voted on this mitigator as a whole, rather than as to each nonstatutory mitigating circumstance.

- 15 -

The jury unanimously found that Bright should be sentenced to death for the murder of Brown.

The trial court conducted a *Spencer* hearing on November 1, 2017. Bright's daughter, Tenneka Bright, testified as to the close relationship she has with her father and the fact that he has always been there for her. She also testified that in the days before the murders she was not able to reach her father by phone and that when she called his number someone else answered. A classification officer from the correctional institution where Bright is incarcerated testified that Bright had no disciplinary reports.

On December 8, 2017, the trial court entered its sentencing order, imposing a sentence of death on Bright for each murder. As to King, the trial court found that the State had proven beyond a reasonable doubt the statutory aggravators that Bright was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person, § 921.141(6)(b), Fla. Stat. (2017) (the 1990 conviction for armed robbery and the contemporaneous murder) (great weight), and that the murder was especially heinous, atrocious, or cruel (HAC), § 921.141(6)(h), Fla. Stat. (2017) (great weight). As to Brown, the trial court found that the State had proven beyond a reasonable doubt the statutory aggravator that Bright was previously convicted of another capital felony or of a felony

- 16 -

involving the use or threat of violence to the person (the 1990 conviction for armed robbery and the contemporaneous murder) (great weight).

The trial court rejected the two statutory mitigating circumstances presented by Bright with respect to each murder—that the murder was committed while Bright was under the influence of extreme mental or emotional disturbance, § 921.141(7)(b), Fla. Stat. (2017), and that Bright's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, § 921.141(7)(f), Fla. Stat. (2017). The trial court considered thirty-eight nonstatutory mitigating circumstances under the catch-all provision for the existence of any other factors in the defendant's background that would mitigate against imposition of the death penalty, § 921.141(7)(h), Fla. Stat. (2017). The trial court grouped the nonstatutory mitigators into six categories, found each established, and assigned no or little weight to each category. Specifically, the trial court found: (1) Bright was the victim of child abuse and

neglect[7] (no weight); (2) Bright's military career[8] (little weight); (3) Bright's

history of drug and alcohol abuse[9] (little weight); (4) Bright's positive

_____

7. This category included the following nonstatutory mitigating circumstances: (1) Bright was forced to work long hours as a child in his father's junkyard; (2) Bright was not allowed to play with other children while growing up; (3) Bright's father made him work in the junkyard through injury; (4) Bright suffered an eye injury while working in the junkyard that still affects him; (5) Bright was a victim of violence and abuse; (6) Bright's father would beat him for hours at a time, drawing blood, leaving welts, and rendering him unconscious; (7) Bright grew up extremely poor with no running water, adequate heating, or trash collection; (8) Bright would wet the bed and was beaten for it; (9) Bright stuttered and was beaten for that; (10) Bright was choked by his older brother until he was unconscious; (11) Bright was sexually abused by his older brother; (12) Bright's father fired a gun around the house; (13) Bright's father beat and raped his mother; (14) Bright's father was an alcoholic; (15) Bright's father would disappear for days and weeks at a time; (16) Bright was a poor student because of his home life; (17) Bright's punctuality at school was poor; and (18) Bright ran away from home after high school.

8. This category included the following nonstatutory mitigating circumstances: (1) Bright served in the Marine Corps for nine years as a jet mechanic; (2) Bright had multiple promotions in the Marine Corps, including a meritorious promotion; (3) Bright received two separate awards for good conduct; (4) Bright received a "meritorious mast" for noticing a problem with a jet upon take-off; (5) Bright served in the Red Sea and went to Africa for a deployment; (6) Bright attended a noncommissioned officer leadership course where he learned basic leadership skills and discipline; (7) Bright was presented with a certificate of appreciation; (8) Bright achieved the rank of sergeant; and (9) Bright received two honorable discharges and one "general under honorable conditions" discharge from the Marines.

9. This category included the nonstatutory mitigating circumstances that Bright struggled with drugs and alcohol use for decades and has sought help for his substance abuse problems on multiple occasions.

relationships with others[10] (little weight); (5) Bright's good and mannerly behavior during court proceedings (no weight); and (6) Bright's behavior while incarcerated (no weight).

The trial court found that the "aggravating circumstances heavily outweigh the mitigating circumstances, and that death is the proper penalty the Court should impose for the murders of Derrick King and Randall Brown." Bright appeals from the trial court's order imposing sentences of death for the murders of King and Brown.

## II. ANALYSIS

On appeal, Bright raises the following five claims: (1) the trial court committed fundamental error by failing to instruct the jury that it must determine beyond a reasonable doubt whether the aggravators were sufficient to impose death and outweighed the mitigators; (2) the prosecutor made multiple improper comments during closing argument constituting fundamental error; (3) there was insufficient evidence to support the finding of the especially heinous, atrocious, or

---

10. This category included the following nonstatutory mitigating circumstances: (1) Bright took care of his sister when she was young; (2) Bright repaired a roof on his sister's house after a hurricane; (3) Bright is a good friend; (4) Bright is very close to his daughter; (5) Bright is close with his grandchildren; (6) Bright's family will continue to foster their relationships with him while he is incarcerated; (7) Bright encouraged his daughter to go to college; and (8) Bright's daughter loves him unconditionally and is grateful for their relationship.

cruel aggravator; (4) the trial court abused its discretion in rejecting statutory mitigating circumstances and in assigning no weight to the nonstatutory mitigation of Bright's childhood abuse; and (5) the sentences of death are not proportionate. We address each claim in turn.

### A. Sufficiency of the Jury Instructions

Bright argues that the trial court erred by failing to instruct the jury that it must determine beyond a reasonable doubt whether the aggravating factors were sufficient to impose a sentence of death and whether those factors outweighed the mitigating circumstances. Bright's argument has no merit.

"[S]ubsequent to our decision in *Hurst v. State*, we already have receded from the holding that the additional *Hurst v. State* findings are elements." *State v. Poole*, 45 Fla. L. Weekly S41 (Fla. Jan. 23, 2020). In *Rogers v. State*, 285 So. 3d 872, 885-86 (Fla. 2019), we clarified:

> To the extent that in *Perry v. State*, 210 So. 3d 630, 633 (Fla. 2016), we suggested that *Hurst v. State* held that the sufficiency and weight of the aggravating factors and the final recommendation of death are elements that must be determined by the jury beyond a reasonable doubt, we mischaracterized *Hurst v. State*, which did not require that these determinations be made beyond a reasonable doubt. Since *Perry*, in *In re Standard Criminal Jury Instructions in Capital Cases* [244 So. 3d 172 (Fla. 2018)] and *Foster* [*v. State*, 258 So. 3d 1248 (Fla. 2018)], we have implicitly receded from its mischaracterization of *Hurst v. State*. We now do so explicitly. Thus, these determinations are not subject to the beyond a reasonable doubt standard of proof, and the trial court did not err in instructing the jury.

Thus, because the trial court did not err in failing to instruct the jury to determine beyond a reasonable doubt whether the aggravating factors were sufficient and outweighed mitigating circumstances, no fundamental error occurred,[11] and Bright is not entitled to relief on this claim.

## B. Improper Prosecutorial Comments in Closing Argument

Bright next asserts that the State's prosecutor made multiple improper comments during closing argument. As an initial matter, Bright's counsel did not contemporaneously object to the comments Bright now raises as error on appeal. Generally, the failure to contemporaneously object to allegedly improper closing argument comments waives the issue for review. *Card v. State*, 803 So. 2d 613, 622 (Fla. 2001) ("As a general rule, the failure to raise a contemporaneous objection when improper closing argument comments are made waives any claim concerning such comments for appellate review."); *Urbin v. State*, 714 So. 2d 411, 418 n.8 (Fla. 1998) ("We have long held that allegedly improperly [sic] prosecutorial comments are not cognizable on appeal absent a contemporaneous objection."). "The sole exception to the general rule is where the unobjected-to comments rise to the level of fundamental error." *Walls v. State*, 926 So. 2d 1156, 1176 (Fla. 2006); *accord Card*, 803 So. 2d at 622. "This is a high burden which

---

11. Because the trial court did not err, we do not reach the State's argument that Bright waived fundamental error review by agreeing to the jury instructions.

requires an error that 'goes to the foundation of the case or the merits of the cause of action and is equivalent to a denial of due process.' " *Bailey v. State*, 998 So. 2d 545, 554 (Fla. 2008) (quoting *Johnson v. State*, 969 So. 2d 938, 955 (Fla. 2007)). Fundamental error "has also been described as error that is so significant that the sentence of death 'could not have been obtained without the assistance of the alleged error.' " *Poole v. State*, 151 So. 3d 402, 415 (Fla. 2014) (quoting *Snelgrove v. State*, 107 So. 3d 242, 257 (Fla. 2012)).

First, Bright argues that the prosecutor erroneously told the jury to ignore evidence of mitigation (i.e., that Bright suffered childhood abuse) in contravention of the United States Supreme Court's mandate in *Eddings v. Oklahoma*, 455 U.S. 104 (1982), that the sentencer in a capital case consider mitigation evidence. *See id.* at 113-14 ("Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence."). The allegedly improper comment, to which defense counsel did not object, is as follows:

> Your decision should not be influenced by feelings of prejudice or by racial or ethnic bias or sympathy. That's not a basis for your decision, that he was abused, et cetera. No. You cannot have sympathy for that in terms of - - it's mitigation and aggravation. You can't have sympathy for the victim or the defendant - - for the victims, I should say.

Here, the prosecutor did not instruct the jurors to disregard evidence of Bright's abuse in reaching their decisions, but rather, explained that the evidence

of abuse is properly considered as mitigation, and that their decisions may not be based upon sympathy. *See Zack v. State*, 753 So. 2d 9, 24 (Fla. 2000) ("[T]he State's argument concerning sympathy was a proper admonition for the jurors to consider the mitigation evidence without resort to their emotions." (footnote omitted)); *see also Saffle v. Parks*, 494 U.S. 484, 493 (1990) ("[N]othing in . . . *Eddings* prevents the State from attempting to ensure reliability and nonarbitrariness by requiring that the jury consider and give effect to the defendant's mitigating evidence in the form of a 'reasoned *moral* response,' rather than an emotional one." (citation omitted) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987))). Furthermore, the prosecutor's argument concerning sympathy was consistent with the final jury instructions read by the trial court to the jury,[12] which in turn mirrored interim amended jury instruction 7.11(a) Final Instructions in Penalty Proceedings—Capital Cases.[13] As such, the prosecutor's comments were not error, much less fundamental error.

12. The trial court instructed the jury as follows:

> Your decision must not be based upon the fact that you feel sorry for anyone or are angry at anyone.
> . . . .
> Your decisions should not be influenced by feelings of prejudice, racial or ethnic bias or sympathy. Your decisions must be based upon the evidence and the law contained in these instructions.

13. *See In re Std. Crim. Jury Instrs. in Capital Cases*, 214 So. 3d 1236, 1266 (Fla. 2017) (appendix) ("Rules for deliberation. . . . 3. Your decisions must

- 23 -

Second, Bright argues that the prosecutor improperly instructed the jury that the only way to follow the law was to vote for death. Bright points to the following statement by the prosecutor, to which Bright's counsel did not object:

> And by the way, as we stressed about in jury selection, you're never compelled to actually vote for death. But I would submit to you that this is the case that you should in terms of following the law.

This Court has held that it is improper for a prosecutor to assert in closing argument that it is a juror's duty under the law to vote for a sentence of death rather than life. For example, in *Urbin*, the prosecutor argued to the jury that "my concern is that some of you may be tempted to take the easy way out, to not weigh the aggravating circumstances and the mitigating circumstances and not want to fully carry out your responsibility and just vote for life," and "I'm going to ask you not be swayed by pity or sympathy. . . . I'm going to ask you to follow the law. I'm going to ask you to do your duty." 714 So. 2d at 421. This Court found the comments improper because they "implied that the jury was *required by law* to return a recommendation of death." *Braddy v. State*, 111 So. 3d 810, 851 (Fla. 2012) (emphasis in original) (quoting *Wade v. State*, 41 So. 3d 857, 871 (Fla. 2010) (addressing the holding in *Urbin*)); *see also Davis v. State*, 136 So. 3d 1169,

---

not be based upon the fact that you feel sorry for anyone or are angry at anyone. . . . 6. Your decisions should not be influenced by feelings of prejudice, racial or ethnic bias, or sympathy. Your decisions must be based on the evidence and the law contained in these instructions.").

1207 (Fla. 2014) ("[T]his Court has concluded that it is improper for the State to tell jurors that 'the only proper recommendation to this court is a recommendation of death' or that the jurors have a legal duty to recommend the 'appropriate punishment' of death."). Here, however, the prosecutor's comment that the jurors "should" vote for a sentence of death did not imply that they were required by law to do so. Indeed, immediately before the comment, the prosecutor correctly told the jurors that they are never compelled to vote for death. Thus, the allegedly improper comment was not error, much less fundamental error.

Next, Bright argues that the prosecutor misstated the burden of proof for mitigating circumstances. Again, Bright's counsel did not object to the following comment:

> Then you go, okay, what - - what mitigation has been proven? And remember, we talked about that mitigation doesn't have to be proven beyond a reasonable doubt. It's just a reasonable certainty.

This Court has held that a mitigating circumstance exists where it is established by the greater weight of the evidence. *See Diaz v. State*, 132 So. 3d 93, 117 (Fla. 2013) (stating that established law recognizes "that mitigating factors [must] be 'established by the greater weight of the evidence' " (quoting *Mansfield v. State*, 758 So. 2d 636, 646 (Fla. 2000))); *Bolin v. State*, 117 So. 3d 728, 740 (Fla. 2013) ("The trial court must find a mitigating circumstance if it 'has been established by the greater weight of the evidence.' " (quoting *Coday v. State*, 946

So. 2d 988, 1003 (Fla. 2006))). Thus, as the State properly acknowledges, the prosecutor's comment that the mitigation must be proven to a reasonable certainty was erroneous.

In determining whether a comment found to be improper constitutes fundamental error, this Court's consideration "include[s] whether the statement was repeated and whether the jury was provided with an accurate statement of the law after the improper comment was made." *Poole*, 151 So. 3d at 415. Here, the prosecutor did not repeat the improper burden of proof in closing argument. Additionally, the final jury instructions read by the trial court to the jury included an accurate statement of the law on the burden of proof regarding mitigating circumstances.[14] We therefore find that the prosecutor's single misstatement of the law was not so harmful that the sentence of death could not have been obtained without the assistance of the error. Accordingly, the prosecutor's comment does

---

14. The trial court instructed the jury as follows:

As explained before these proceedings, the defendant need only establish a mitigating circumstance by the greater weight of the evidence, which means the evidence that more than likely - - more likely than not tends to establish the existence of a mitigating circumstance. If you determine by the greater weight of the evidence that a mitigating circumstance exists, you must consider it established and give that evidence such weight as you determine it should receive in reaching your verdict about the appropriate sentence to be imposed.

not rise to the level of fundamental error. *See Kaczmar v. State*, 228 So. 3d 1, 12 (Fla. 2017) (finding that prosecutor's improper characterization of mitigating evidence did not rise to the level of fundamental error where comment was made only once, and the trial court read the standard jury instructions, which included an accurate statement of the law).

Finally, Bright argues that the prosecutor mischaracterized mitigation as a "credit" for Bright. The comments, to which defense counsel did not object, are as follows:

> Defendant's character? I guess they're going to say - - and he did. He served nine years. We've got to give him credit for that. He served nine years in the Marines. . . . Defense is going to go, well, hold on. At one point, he saved some aircraft that potentially could have crashed and potentially saved the life of an airman that was going to fly. He should get credit for that.

Bright appears to be arguing that the prosecutor improperly told the jury that the process of weighing aggravating factors and mitigating circumstances is a quantitative analysis. *See, e.g.*, *Taylor v. State*, 937 So. 2d 590, 601 (Fla. 2006) (holding that the process of weighing aggravating and mitigating circumstances during capital sentencing proceedings is not a quantitative comparison). The prosecutor's comments, however, are more properly read as the State's acknowledgment that Bright's service in the Marines, including his action of discovering a potentially fatal mechanical problem with an aircraft, constitutes a mitigating circumstance. A review of the prosecutor's entire closing argument

- 27 -

shows that no other proposed mitigation was characterized as a "credit" for Bright. Accordingly, the prosecutor did not impermissibly argue to the jury that its weighing process should be conducted by comparing the number of aggravating factors with the number of mitigating circumstances.

Bright also contends that the cumulative effect of the prosecutor's improper remarks constituted fundamental error. *See Card*, 803 So. 2d at 622 ("We do not examine allegedly improper comments in isolation. Rather, the Court examines the totality of the errors in the closing argument and determines whether the cumulative effect of the numerous improprieties deprived the defendant of a fair penalty phase hearing."). A review of the unobjected-to comments made by the prosecutor, however, shows that only one comment was improper—the misstatement of law as to burden of proof for mitigators—and that this single error did not rise to the level of fundamental error. A single improper comment in closing argument does not support a cumulative error analysis. *See, e.g.*, *Diaz*, 132 So. 3d at 118 ("[A] cumulative error claim fails when there are not multiple errors."); *Johnson v. State*, 104 So. 3d 1010, 1029 (Fla. 2012) ("[The defendant], however, has failed to identify multiple instances of error. And because multiple errors did not occur in this case, [the defendant]'s claim of cumulative error must fail."). Accordingly, Bright's claim of cumulative error fails as well.

Because none of the allegedly improper comments—either individually or cumulatively—rise to the level of fundamental error, Bright is not entitled to relief with regard to this claim. *See Braddy*, 111 So. 3d at 846 ("Likewise if any unpreserved improper comments do not individually or cumulatively constitute fundamental error, we will not reverse [the defendant's] sentence.").

### C. Especially Heinous, Atrocious, or Cruel Aggravating Factor

Bright argues that there was insufficient evidence to support the trial court's finding of the "especially heinous, atrocious, or cruel" (HAC) aggravator. § 921.141(6)(h), Fla. Stat. (2017). Specifically, Bright contends that the evidence was insufficient to support the finding of the HAC aggravator because there is no evidence that King was conscious and aware of his impending death. Because we find that there was competent, substantial evidence that King was conscious and aware of impending death, Bright's claim is without merit.

"When reviewing claims alleging error in the application of aggravating factors, this Court does not reweigh the evidence." *McGirth v. State*, 48 So. 3d 777, 792 (Fla. 2010); *accord Willacy v. State*, 696 So. 2d 693, 695 (Fla. 1997) ("[I]t is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt—that is the trial court's job."). Instead, "[i]n reviewing an aggravating factor challenged on appeal, this Court's task 'is to review the record to determine whether the trial

- 29 -

court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.' " *Douglas v. State*, 878 So. 2d 1246, 1260-61 (Fla. 2004) (quoting *Willacy*, 696 So. 2d at 695).

This Court has previously defined the HAC aggravator as follows:

It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies—the conscienceless or pitiless crime which is unnecessarily torturous to the victim.

*Hernandez v. State*, 4 So. 3d 642, 668-69 (Fla. 2009) (quoting *State v. Dixon*, 283 So. 2d 1, 9 (Fla. 1973)). The HAC aggravator focuses on the means and manner of the victim's death and the immediate circumstances surrounding the death. *See Pham v. State*, 70 So. 3d 485, 497 (Fla. 2011); *McGirth*, 48 So. 3d at 794. "[I]n order to support a finding of this aggravator, 'the evidence must show that the victim was conscious and aware of impending death.' " *King v. State*, 130 So. 3d 676, 684 (Fla. 2013) (quoting *Douglas*, 878 So. 2d at 1261). However, "the victim's perception of imminent death need only last seconds for this aggravator to apply." *Gonzalez*, 136 So. 3d at 1157; *see also Buzia v. State*, 926 So. 2d 1203, 1214 (Fla. 2006) (finding that victim was aware of impending death "[w]hether this state of consciousness lasted minutes or seconds" and upholding HAC

aggravator). Relevant here, "[t]his Court has 'consistently upheld HAC in beating deaths.' " *Douglas*, 878 So. 2d at 1261 (quoting *Lawrence v. State*, 698 So. 2d 1219, 1222 (Fla. 1997)); *accord King*, 130 So. 3d at 684; *see also, e.g.*, *Buzia*, 926 So. 2d at 1214 (upholding the HAC aggravator where victim was struck with a fist and an ax and was awake and aware for at least part of the ordeal); *Dennis v. State*, 817 So. 2d 741, 766 (Fla. 2002) (upholding finding of HAC aggravator where victims suffered skull fractures as a result of beating and were conscious for at least part of the attack); *Beasley v. State*, 774 So. 2d 649, 671 (Fla. 2000) (holding that competent, substantial evidence supported the trial court's finding of the HAC aggravator where victim suffered blunt trauma to the head by a hammer and was not rendered immediately unconscious as evidenced by defensive injuries).

Bright contends that the evidence was insufficient to support the trial court's finding of HAC because there is no evidence that King was conscious and aware of his impending death. Specifically, Bright relies upon Dr. Rao's testimony during cross-examination that each blow to the head that caused a skull fracture could have caused death by itself. Bright's argument, however, ignores case law from this Court explaining that "[t]he existence of defensive wounds is relevant to the HAC analysis." *King*, 130 So. 3d at 684. Where, like here, the sequence of injuries cannot be established, this Court has found that evidence of defensive wounds indicates that the victim was conscious and aware of impending death.

- 31 -

For example, in *King*, this Court concluded that the trial court's finding of the HAC aggravator was supported by competent, substantial evidence where the medical examiner testified that the victim was struck seventeen times with a hammer. *Id.* at 686. "Three of the blows were to the head, which would have been fatal and rendered the victim unconscious." *Id.* at 680. Although the medical examiner could not testify to the sequence of the blows inflicted on the victim, this Court found that "[t]he defensive wounds to the victim's hand and arm clearly demonstrate that the victim was conscious and aware of her impending death and attempting to fend off the attack." *Id.* at 685.

Similarly, in *Douglas*, the medical examiner could not determine the sequence of injuries to the victim, who died of blunt head trauma, and testified that "if the first injury inflicted was one of the more severe [the victim] could have been rendered unconscious." 878 So. 2d at 1251, 1262. On appeal, the defendant argued that the evidence left open the possibility that the victim lost consciousness after the first blow. *Id.* at 1262. This Court upheld the trial court's finding of the HAC aggravator, relying upon the medical examiner's testimony that it was "*not likely*" that the victim was rendered unconscious by the first blow given that she turned her head during the beating and suffered defensive wounds to her hands and forearms. *Id.*; *see also Boyd v. State*, 910 So. 2d 167, 191 (Fla. 2005) (finding that "[w]hile the exact order of wounds could not be established, there was competent,

substantial evidence to support the trial court's finding that [the victim] was alive and conscious for some of the attack, and was struggling with her attacker" where victim sustained defensive wounds); *Beasley*, 774 So. 2d at 670 (rejecting defendant's argument that the murder was not HAC because the victim might have been rendered immediately unconscious by blows from a hammer where evidence of defensive wounds existed).

Here, there was competent, substantial evidence in the record to support the finding of the HAC aggravator. Dr. Rao testified that King received thirty-eight blunt impact injuries to his head and about twenty injuries to his extremities and that the injuries were consistent with being caused by a hammer. Dr. Rao also testified that King was alive when these injuries were inflicted and that he suffered. Significantly, King had numerous defensive wounds: bruising on his left arm; a fracture of his left ulna; abrasions and bruising of the entire back of his left hand; bruising and abrasions on his right forearm and back of his right hand; and an abrasion and laceration on his left knee. Although Dr. Rao testified on cross-examination that each blow to the head that caused a skull fracture and brain injury could have caused death by itself, Dr. Rao also opined that King's defensive wounds evidenced that he was not rendered unconscious after one blow. Thus, competent, substantial evidence supports the finding of the HAC aggravator.

Bright relies on *Williams v. State*, 37 So. 3d 187 (Fla. 2010), in support of his argument that there is insufficient evidence to support the trial court's finding of the HAC aggravator. In *Williams*, this Court struck the HAC aggravator, concluding that given the lack of any defensive wounds and the speculative nature of other evidence relied upon by the trial court, there was no evidence to support the trial court's finding that the victim was conscious and aware of impending death. *Id.* at 200-01. As Dr. Rao's testimony established that King suffered defensive wounds, *Williams* is not analogous. Bright's reliance on *Elam v. State*, 636 So. 2d 1312 (Fla. 1994), is also misplaced. In *Elam,* this Court held that the trial court erred in finding the HAC aggravator where, although the victim suffered "defensive wounds, the medical examiner testified that the attack took place in a very short period of time ('could have been less than a minute, maybe even half a minute'), the defendant was unconscious at the end of this period, and never regained consciousness." *Id.* at 1314. This Court subsequently declined to apply *Elam* in *Rolling v. State*, 695 So. 2d 278 (Fla. 1997), where the evidence demonstrated that the victim, who was stabbed while asleep in her bed, "sustained several defensive wounds to her arms and leg, and did not die instantaneously." *Id.* at 296. We find the instant case more akin to *Rolling*, where King's defensive wounds negate the possibility that he was rendered immediately unconscious after in initial blow to the head. *Cf. Perez v. State*, 919 So. 2d 347, 378-79 (Fla. 2005)

(finding *Elam* "clearly distinguishable" where victim suffered defensive wounds and blunt force trauma to the head, was stabbed ninety-four times, and the medical examiner testified that the victim "would have lost consciousness within a matter of a few seconds to as much as two minutes" after receiving the fatal stab wound).

Because competent, substantial evidence supports the finding of the HAC aggravator as to the murder of King, Bright is not entitled to relief on this claim.

### D. Mitigating Circumstances

Bright also argues that the trial court erred in rejecting the two statutory mitigating circumstances presented with respect to both murders: (1) that Bright committed the murders while he was "under the influence of extreme mental or emotional disturbance," § 921.141(7)(b), Fla. Stat. (2107), and (2) that Bright's "capacity . . . to appreciate the criminality of his . . . conduct or to conform his . . . conduct to the requirements of law was substantially impaired," § 921.141(7)(f), Fla. Stat. (2017). Bright further argues that the trial court abused its discretion in assigning no weight to the nonstatutory mitigating circumstance of his abusive childhood. As explained below, we find the trial court did not abuse its discretion by not finding that either statutory mitigating circumstance was established or by assigning no weight to the nonstatutory circumstance of Bright's abusive childhood.

- 35 -

"Where it is clear that the trial court has considered all evidence presented in support of a mitigating factor, the court's decision as to whether that circumstance is established will be reviewed only for abuse of discretion." *Ault v. State*, 53 So. 3d 175, 186-87 (Fla. 2010). A trial court's determinations on the issue will be upheld when supported by competent, substantial evidence. *Hoskins v. State*, 965 So. 2d 1, 17 (Fla. 2007). "A trial court must find a proposed mitigating circumstance when the defendant has established that mitigator through competent, substantial evidence." *Oyola v. State*, 99 So. 3d 431, 444 (Fla. 2012). "A trial court may reject a defendant's claim that a mitigating circumstance has been proved, however, provided that the record contains 'competent substantial evidence to support the trial court's rejection of these mitigating circumstances.' " *Nibert v. State*, 574 So. 2d 1059, 1062 (Fla. 1990) (quoting *Kight v. State*, 512 So. 2d 922, 933 (Fla. 1987)). "A mitigator may . . . be rejected if the testimony supporting it is not substantiated by the actions of the defendant, or if the testimony supporting it conflicts with other evidence." *Oyola*, 99 So. 3d at 445. With regard to expert opinion testimony, "[e]ven uncontroverted opinion testimony can be rejected, especially when it is hard to reconcile with the other evidence presented in the case." *Philmore v. State*, 820 So. 2d 919, 936 (Fla. 2002). With these principles in mind, we address each of Bright's arguments in turn.

### 1. Extreme Mental or Emotional Disturbance Mitigator

Bright argues that the trial court erred in failing to find the statutory mitigating circumstance that he committed the murders while under the influence of extreme mental or emotional disturbance.[15] Because there is competent, substantial evidence in the record to support the trial court's finding, we disagree.

In support of his argument, Bright relies upon Dr. Gold's testimony that he diagnosed Bright with PTSD. Dr. Gold testified that Bright's PTSD played a role in this case because Bright perceived that he was in danger in his home, which was impacted by the trauma of his childhood abuse. Dr. Gold further opined that as a result of Bright's mounting sense of fear in his home, Bright killed King and Brown while he was under the influence of extreme mental or emotional disturbance. Unlike Dr. Gold, however, Dr. Krop, who evaluated Bright shortly after the murders in 2008 and 2009, did not diagnose Bright with PTSD. Dr. Krop testified that there were several reasons he did not diagnose Bright with PTSD at the time of his evaluation. First, records Dr. Krop reviewed from the time Bright received treatment from the Veteran's Administration contained no indication of PTSD. Second, as reflected in a report authored by Dr. Krop in August 2008, Bright stated that he had a normal childhood, free from abuse and trauma.

---

15. The statutory mitigator of extreme emotional disturbance "has been defined as 'less than insanity, but more emotions than the average man, however inflamed.'" *Foster v. State*, 679 So. 2d 747, 756 (Fla. 1996) (quoting *Duncan v. State*, 619 So. 2d 279, 283 (Fla. 1993)).

Furthermore, the psychological testing Dr. Krop conducted on Bright, including the Beck Anxiety Inventory, Beck Depression Inventory, and the MMPI-2, did not suggest a basis for a PTSD diagnosis. Thus, the trial court's finding that the extreme mental or emotional disturbance mitigator was not established was supported by competent, substantial evidence in the record that Bright was not suffering from PTSD at the time of the murders.

We therefore conclude that the trial court did not abuse its discretion in rejecting this proposed mitigating circumstance. *See Foster v. State*, 679 So. 2d 747, 755 (Fla. 1996) ("As long as the court considered all of the evidence, a trial judge's determination of lack of mitigation will stand absent a palpable abuse of discretion.").

### 2. Capacity to Appreciate the Criminality of Conduct or Conform Conduct to the Requirements of Law

Bright next argues that he presented unrebutted expert testimony through Dr. Gold that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, and that the trial court abused its discretion in rejecting this mitigator. Bright's claim is without merit.

"A mitigator may . . . be rejected if the testimony supporting it is not substantiated by the actions of the defendant, or if the testimony supporting it conflicts with other evidence." *Oyola*, 99 So. 3d at 445. Indeed, even "[w]hen

- 38 -

expert opinion evidence is presented, it 'may be rejected if that evidence cannot be reconciled with the other evidence in the case.' " *Williams*, 37 So. 3d at 204 (quoting *Coday*, 946 So. 2d at 1003).

In finding that this mitigator had not been proven by a greater weight of the evidence, the trial court stated as follows in its sentencing order:

> Defendant took actions immediately after committing the crimes that suggest he was attempting to conceal his identity. Defendant used and then disposed of gloves in order to conceal his fingerprints, he hid the murder weapon, and he fled his home. All of these actions are consistent with someone who understands their actions are wrong and is attempting to avoid the repercussions of what they have done.

As this Court explained in *Ault*, 53 So. 3d 175, a defendant's purposeful actions after the crime indicating that the defendant was aware of the criminality of his conduct may be sufficient to reject a defendant's claim that this mitigator applies. In *Ault*, the defendant admitted that he murdered the victims out of fear of going to jail, placed the victims' bodies in his attic, and lied to the victims' mother and the police regarding his knowledge of the victims' disappearance. *Id.* at 189. This Court found that the record demonstrated that the defendant was not substantially impaired in his ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, explaining:

> We have upheld a trial court's rejection of this mitigating circumstance when a defendant's actions during and after the crime has indicated that he was aware of the criminality of his conduct. In *Nelson v. State*, 850 So. 2d 514, 531 (Fla. 2003), for example, we upheld the trial court's ruling where the defendant removed the victim

from her home after sexually assaulting her, drove to two separate orange groves before killing her, and lied to police about the crime. We found that the defendant's "purposeful actions [were] indicative of someone who knew those acts were wrong and who could conform his conduct to the law if he so desired." *Id.* Similarly, in *Hoskins v. State*, 965 So. 2d 1, 18 (Fla. 2007), we found that the trial court properly rejected the defendant's inability "to appreciate the criminality of his conduct" as mitigation where, after raping the victim, "Hoskins's purposeful actions in binding and gagging [the victim] before placing her in the trunk, driving to his parents' home six hours away, borrowing a shovel, driving to a remote area where he killed [the victim], and then telling his brother he hit a possum when blood was noticed dripping from the rear wheel well [were] indicative of someone who knows his conduct is wrong."

53 So. 3d at 188-89 (alterations in original).

Here, Bright's purposeful actions after the murders are indicative of someone who knew that his actions were criminal and could conform his conduct to the law. Specifically, there was testimony that Bright fled his home after the murders. Additionally, there was testimony from a crime scene investigator and police officers from the Jacksonville Sheriff's Office that Bright concealed the murder weapon by burying it deeply in his backyard. Thus, Bright's purposeful actions after the murders constitute competent, substantial evidence to support the trial court's rejection of this mitigating circumstance. Accordingly, we reject Bright's claim on this issue.

### 3. The Existence of Any Other Factors in the Defendant's Background That Would Mitigate Against Imposition of the Death Penalty

Bright also argues that the trial court abused its discretion in assigning no weight to the nonstatutory mitigating circumstance that Bright was the victim of childhood abuse and neglect. This argument is without merit.

"A trial court's decision with regard to the weight to be assigned to a mitigating circumstance that it determines has been established is 'within the trial court's discretion, and its decision is subject to the abuse-of-discretion standard.' " *Perez*, 919 So. 2d at 372 (quoting *Kearse v. State*, 770 So. 2d 1119, 1133 (Fla. 2000)); *accord Allen v. State*, 137 So. 3d 946, 967 (Fla. 2013). This includes the discretion to assign an established mitigating circumstance no weight. *Trease v. State*, 768 So. 2d 1050, 1055 (Fla. 2000) ("We hereby recede from our opinion in *Campbell* [*v. State*, 571 So. 2d 415, 420 (Fla. 1990]] to the extent it disallows trial courts from according no weight to a mitigating factor and recognize that there are circumstances where a mitigating circumstance may be found to be supported by the record, but given no weight."); *accord Mullens v. State*, 197 So. 3d 16, 30 (Fla. 2016) (stating that a trial court "may conclude that a particular mitigating circumstance exists, but assign it no weight"). Under the abuse of discretion standard, a trial court's determination as to the weight assigned to a mitigating circumstance will be upheld unless "no reasonable [person] would take the view

adopted by the trial court." *Perez*, 919 So. 2d at 372 (alteration in original) (quoting *Trease*, 768 So. 2d at 1053 n.2.).

This Court addressed a trial court's refusal to grant nonstatutory mitigating circumstances any weight in *Cox v. State*, 819 So. 2d 705 (Fla. 2002). In *Cox*, the trial court assigned slight or no weight to the "mitigating nature of [the defendant's] childhood." *Id.* at 722. In finding that the trial court did not abuse its discretion in assigning no weight to certain mitigating circumstances, this Court reasoned that the trial court "simply attempted to place the appellant's mitigation evidence in context. The trial court's holdings regarding certain of the appellant's proffered mitigators resulted from an absolute dearth of evidence contained in the record supporting the notion that the cited mitigators are relevant to the defendant in the instant case." *Id.* at 723 (footnote omitted). The trial court's "attempt[] to place the appellant's mitigation evidence in context" was demonstrated in the trial court's statement that:

> While the evidence supports the existence of his heightened anxiety in dealing with other people, the evidence does not support any conclusions or even speculations as to how it contributed to Mr. Cox's decisions and actions that led to [the victim's] death. . . . Thus, while established by Dr. McMahon's opinion, the court declines to afford any weight to this circumstance.

*Id.* at 723 n.15.

Here, the trial court found that the nonstatutory mitigating circumstance of Bright's childhood abuse and neglect had been established but assigned it no weight, concluding:

> More notably, there is a disconnect between Defendant's trauma and the offenses. Once Defendant left his home and joined the military he was a productive member of society and there is no evidence that the trauma in his childhood prevented him from living like a normal person. Therefore, the Court finds that the non-statutory mitigators under this heading have been established, however, the Court assigns no weight to these mitigators.

Thus, as in *Cox*, the trial court in the present case simply placed the mitigation evidence in the context of the other evidence presented. Specifically, the trial court considered the mitigating circumstance of Bright's childhood in the context of Bright's subsequent ability as an adult to serve in the military and function productively such that the abuse and neglect Bright suffered as a child were shown to have no real bearing on Bright's action in committing the murders.

Accordingly, because we cannot conclude that no reasonable person would have assigned the mitigating circumstance of Bright's childhood abuse and neglect no weight, we conclude that the trial court did not abuse its broad discretion in assigning no weight to this mitigating circumstance.

### E. Proportionality

Finally, Bright argues that the sentences of death are disproportionate because his case is not among the most aggravated and least mitigated of first-

degree murder cases.  We find that the sentence of death is proportionate in both murders.

This Court has explained proportionality review as follows:

> This Court reviews the proportionality of each death sentence "to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the [death] sentence." *Anderson v. State*, 841 So. 2d 390, 407-08 (Fla. 2003) (citation omitted).  In conducting its proportionality review, this Court does not compare the number of aggravating and mitigating circumstances. *Pham v. State*, 70 So. 3d 485, 500 (Fla. 2011).  Rather, "the Court looks at the totality of the circumstances to determine if death is warranted in comparison to other cases where the sentence of death has been upheld." *Id.* (quoting *England v. State*, 940 So. 2d 389, 408 (Fla. 2006)).

*Cozzie v. State*, 225 So. 3d 717, 734 (Fla. 2017).  A proportionality review therefore entails "a *qualitative* review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis." *Urbin*, 714 So. 2d at 416.

Although the same mitigating circumstances apply, the jury found different aggravating factors for each murder.  Because it has fewer aggravating factors, we first address the murder of Brown.

As to the murder of Brown, a unanimous jury and the trial court found one aggravating factor—that Bright was previously convicted of a capital felony or a felony involving the use or threat of violence to a person or both (great weight). The aggravator was based upon Bright's contemporaneous murder of King and his

- 44 -

1990 conviction for armed robbery. With regard to mitigating circumstances, the jury found the nonstatutory mitigator that there existed other factors in Bright's character, background, or life or the circumstances of the offense mitigating against the imposition of the death penalty to be established by a vote of one to eleven. Within this catch-all mitigator, the trial court found thirty-eight nonstatutory mitigating factors were established, grouped them into six categories, and assigned each category little or no weight. As explained above, we find no abuse of discretion in the trial court finding that no statutory mitigating circumstances had been established.

"[T]his Court has indicated that where only a single valid aggravating circumstance exists, a sentence of death may be inappropriate." *Mullens*, 197 So. 3d at 35. However, where the "single aggravator . . . involved a prior murder or manslaughter," this Court has upheld a sentence of death. *Green v. State*, 975 So. 2d 1081, 1088 (Fla. 2008); *accord Almeida v. State*, 748 So. 2d 922, 933 (Fla. 1999) ("[T]his Court has affirmed the death penalty in single-aggravator cases where a prior murder was involved.").

For example, in *Bolin*, 117 So. 3d at 728, this Court upheld a death sentence based on a single prior violent felony aggravator where that aggravator involved another murder, and the mitigation was not substantial. In *Bolin*, Bolin stabbed and beat the victim to death. The death sentence was found to be proportionate

where the trial court found one aggravator—previously convicted of another capital felony or of a felony involving the use or threat of violence to the person—and assigned it great weight. The aggravator was based upon Bolin's conviction for another first-degree murder, a kidnapping and rape conviction, and a conviction for felonious assault. *Id.* at 742. In mitigation, the trial court found:

> (1) age of defendant at time of crime (24)—little weight; and (2) the following statutory catch-all mitigator of any other factors in the defendant's background that would mitigate against imposition of the death penalty: (a) defendant suffered from the effects of his mother's alcoholism and his own substance abuse—little weight; (b) defendant was abused as a child—some weight; (c) defendant had a poor and unstable childhood—little weight; (d) defendant had sporadic minimal education—little weight; (e) defendant received his GED while incarcerated—little weight; (f) defendant developed skills which included welding, electrical, plumbing, and small machinery skills—little weight; (g) defendant saved the life of another—little weight; (h) defendant was gainfully employed at the time—little weight; (i) defendant behaved appropriately at trial—little weight; (j) defendant has adapted to institutional living and had not received any disciplinary reports—little weight; (k) defendant has been married for eleven years and he seems to maintain that relationship, considering the obvious limitations—little weight; and (l ) defendant's physical and mental medical history indicates several problems—little weight. Additionally, the trial court gave some weight to a finding of some mental or emotional disturbance.

*Id.* at 741. After considering the facts underlying the prior violent felony aggravator and noting that the aggravator is one of the most weighty, this Court characterized the mitigation, which included nonstatutory mitigation similar to that of Bright, as well as "some mental or emotional disturbance," as being of "insubstantial effect" and found the death sentence to be proportionate. *Id.* at 742;

- 46 -

*see also, e.g.*, *Sheppard v. State*, 151 So. 3d 1154 (Fla. 2014) (finding death sentence to be proportionate where trial court found a single aggravator of violent felony conviction based upon an almost contemporaneous murder and earlier violent felonies committed as a juvenile, statutory mitigator of age, and fifteen nonstatutory mitigators); *Rodgers v. State*, 948 So. 2d 655, 672 (Fla. 2006) (finding death penalty proportionate where the trial court found a single aggravator of prior violent felony conviction based on prior convictions for robbery and manslaughter and "insubstantial mitigation" consisting of statutory mitigation based on impoverished background and nonstatutory mitigation); *Ferrell v. State*, 680 So. 2d 390 (Fla. 1996) (finding death sentence proportionate where the trial court found a single aggravator of prior violent felony conviction based on second-degree murder and several nonstatutory mitigating circumstances).

This Court has also found the death sentence proportionate where the single aggravator was based in part upon a contemporaneous murder and mitigation was insubstantial. In *Bevel v. State*, 983 So. 2d 505 (Fla. 2008), Bevel shot and killed two victims, Stringfield and Sims, and attempted to kill a third. As to the murder of Stringfield, the trial court found only one aggravating factor, that the defendant was previously convicted of a capital offense or of a felony involving the use or threat of violence to some person, and assigned it very great weight. *Id.* at 513. The prior violent felony aggravator was based upon the contemporaneous murder

of Sims, the attempted murder of the third victim, and a prior attempted robbery conviction. The trial court found six nonstatutory mitigating circumstances and assigned most little or very little weight.[16] Even though it was a single aggravator case, this Court found the death penalty proportionate given the "minimal nonstatutory mitigation" and the facts upon which the aggravator was based, i.e., the contemporaneous murder of Sims, an attempted murder, and a prior robbery. *Id.* at 525. Indeed, in reaching its conclusion, this Court stated that in looking at the totality of the circumstances, it had to consider the facts upon which the prior violent felony aggravator was based. *See id.* at 524.

Bright argues that his case is analogous to *Nibert*, 574 So. 2d at 1059, where this Court found a death sentence based on a single aggravator and substantial mitigation to be disproportionate. In *Nibert*, Nibert stabbed the victim to death while the two were drinking. *Id.* at 1059-60. The trial court found one aggravating factor—that the murder was committed in an especially heinous, atrocious, or cruel

---

16. The nonstatutory mitigators found were as follows:

> (1) the defendant has religious faith and loves his family members (minimal weight); (2) defendant confessed to the crime (little weight); (3) defendant has exhibited good behavior in jail (very little weight); (4) defendant exhibited good behavior in court (little weight); (5) defendant has an IQ of 65 (little weight); and (6) defendant struggled with the death of his mother (very little weight).

*Bevel*, 983 So. 2d at 513 n.4.

manner. *Id.* at 1061. The trial court found no statutory mitigating circumstances and "possible" nonstatutory mitigation that Nibert had been abused as a child. *Id.* On appeal, this Court found that the trial court erred in rejecting the nonstatutory mitigating circumstance of childhood abuse, as Nibert presented uncontroverted evidence that his mother was an abusive alcoholic who beat him daily. *Id.* at 1062. This Court also found that the trial court should have found the statutory mitigating circumstances that Nibert lacked the capacity to conform his conduct to the requirements of the law and that Nibert was under the influence of extreme emotional or mental disturbance. *Id.* at 1062-63. Concluding that the death penalty was disproportionate, this Court noted that "[t]his case involves substantial mitigation, and we have held that substantial mitigation may make the death penalty inappropriate even when the aggravating circumstance of heinous, atrocious, or cruel has been proved." *Id.* at 1063. We find that *Nibert* is distinguishable from the instant case. While, as in this case, the mitigating circumstances in *Nibert* included childhood abuse, unlike the instant case, they included additional mitigating circumstances—that Nibert's capacity to control his behavior was substantially impaired and that Nibert was under the influence of extreme mental or emotional disturbance. Moreover, in *Nibert*, the record showed that Nibert was drinking when he committed the murder and that Nibert lacked control over his behavior when he drank. *Id.* Here, however, there is no evidence

Bright was intoxicated or under the influence of drugs when he murdered King and Brown.

We hold the death sentence for Brown's murder to be proportionate. Although Bright's death sentence for Brown's murder was based on a single prior violent felony aggravator, that one aggravator was based on two crimes—the contemporaneous murder of King and the 1990 conviction for an armed robbery Bright committed with a knife. The circumstances of the contemporaneous murder were brutal. Bright beat King to death, causing thirty-eight blunt impact injuries to his head and about twenty to his extremities. Dr. Rao testified that King was alive when the injuries were inflicted, and King suffered extensive defensive wounds. The trial court assigned this aggravator great weight, and this Court has stated that the prior violent felony aggravator is one of the most weighty aggravating circumstances in Florida's statutory sentencing scheme. *See Bolin*, 117 So. 3d at 742; *Armstrong v. State*, 73 So. 3d 155, 175 (Fla. 2011). Bright argues that the circumstances surrounding the prior violent felony aggravator are not compelling, speculating that Bright's attack may have been provoked because live rounds were found on top of the television and in the carpet and gunpowder residue was found next to the couch. This argument is not persuasive, however, given that a detective from the Jacksonville Sheriff's Office testified that neither King nor Brown had gunshot residue on his hands. With regard to mitigation, the trial court found that

six categories of nonstatutory mitigation were established, but assigned them little or no weight: (1) Bright was the victim of child abuse and neglect (no weight); (2) Bright's military career (little weight); (3) Bright's history of drug and alcohol abuse (little weight); (4) Bright's positive relationships with others (little weight); (5) Bright's good and mannerly behavior during court proceedings (no weight); and (6) Bright's behavior while incarcerated (no weight). This Court has considered similar nonstatutory mitigation to be of "insubstantial effect." *See Bolin*, 117 So. 3d at 742. Given the totality of the circumstances, including the weighty aggravator of a prior violent felony that was based upon a brutal, contemporaneous murder and our review of the mitigation, we conclude that the death sentence for Brown's murder is proportionate when compared to other single aggravator cases where the single aggravator was weighty and the mitigation was not substantial.

The sentence of death for the murder of King is proportionate as well. As with the murder of Brown, the jury and the trial court found the prior violent felony aggravator for the murder of King (great weight). This aggravator was based in part on the contemporaneous brutal beating death of Brown and Bright's 1990 conviction for armed robbery. However, the jury and trial court additionally found the HAC aggravator for the murder of King, which the trial court assigned great weight. As explained above, there is competent, substantial evidence to

support the finding of the HAC aggravator. "Qualitatively, prior violent felony and HAC are among the weightiest aggravators set out in the statutory sentencing scheme." *Hodges v. State*, 55 So. 3d 515, 542 (Fla. 2010)); *accord Jordan v. State*, 176 So. 3d 920, 936 (Fla. 2015); *Gonzalez*, 136 So. 3d at 1167*; see also Fletcher v. State*, 168 So. 3d 186, 220 (Fla. 2015) ("[T]he HAC aggravator is among the weightiest of the aggravating circumstances."). Bright argues that the HAC aggravator must be considered in light of the fact that Bright felt fearful of King and Brown because they were threatening him in his home. This argument is unpersuasive as there was no evidence presented at the penalty phase proceeding that Bright was in fear of Brown or King, which Bright's counsel conceded below.[17] Regarding the mitigation, as the mitigating circumstances were the same for both murders, our consideration of the mitigating circumstances for the murder of Brown applies equally for the murder of King.

Under the totality of the circumstances, Bright's sentence of death for the murder of King is proportionate in relation to other death sentences this Court has

_____

17. As defense counsel stated during the conference on jury instructions:

I've agreed that there's been no evidence presented that [Bright] was in fear at all of the victims in this case. There was testimony from Miss Jones that she made efforts to get people out of his house, and Mr. [sic] Gold was also able to corroborate that. But I'm not going to alleged [sic] in any way that it was the victims.

upheld with similar aggravation and similar or more substantial mitigation. *See,*
*e.g.*, *Merck v. State*, 975 So. 2d 1054 (Fla. 2007) (finding death sentence
proportionate for stabbing murder where trial court found prior violent felony and
HAC aggravators, statutory age mitigator, and several nonstatutory mitigators,
including a difficult family background, alcohol use the night of the murder, and a
capacity to form positive relationships); *Smithers v. State*, 826 So. 2d 916 (Fla.
2002) (upholding death sentence where victim died from combination of
strangulation, stabbing, and blunt force trauma to the head and trial court found
prior violent felony aggravator, based on contemporaneous murder, and HAC
aggravator, statutory mitigators of under the influence of extreme mental or
emotional disturbance and capacity to appreciate the criminality of conduct or
conform conduct to the requirements of the law substantially impaired, as well as
nonstatutory mitigation); *Singleton v. State*, 783 So. 2d 970 (Fla. 2001) (finding
death sentence proportionate where defendant stabbed a supine victim and trial
court found prior violent felony and HAC aggravators and mitigating
circumstances including under the influence of extreme mental or emotional
disturbance, capacity to appreciate the criminality of conduct or to conform
conduct to the requirements of law substantially impaired, alcoholism, and
honorable service in the military); *Spencer v. State*, 691 So. 2d 1062 (Fla. 1996)
(holding death sentence proportionate where trial court found prior violent felony

aggravator based on contemporaneous convictions for aggravated assault, aggravated battery, and attempted second-degree murder; the HAC aggravator; statutory mitigating circumstances of extreme mental or emotional disturbance and impaired capacity to appreciate criminality of conduct or to conform conduct to requirements of law; and nonstatutory mitigating circumstances including drug and alcohol abuse, sexual abuse, and honorable military record).

Thus, considering the totality of the circumstances in this case, and in comparison with other death cases, we conclude that the sentences of death are proportionate for the murders of Brown and King.

## III. CONCLUSION

Having considered each of Bright's claims, we affirm the sentences of death.

It is so ordered.

CANADY, C.J., and POLSTON, LAWSON, and MUÑIZ, JJ., concur.
LABARGA, J., concurs in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Duval County,
        Russell L. Healey, Judge - Case No. 162008CF002887AXXXMA

Andy Thomas, Public Defender, and A. Victoria Wiggins, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida,

        for Appellant

Ashley Moody, Attorney General, and Lisa A. Hopkins, Assistant Attorney General, Tallahassee, Florida,

for Appellee